The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

David Scott LEE, Defendant-Appellant.

No. 80SA314.

Supreme Court of Colorado,
En Banc.

June 15, 1981.
Rehearing Denied July 6, 1981.

---

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Lynne Ford, Asst. Atty. Gen., Denver, for plaintiff-appellee.

J. Gregory Walta, Colorado State Public Defender, Norman R. Mueller, Deputy State Public Defender, Denver, for defendant-appellant.

QUINN, Justice.

The defendant, David Scott Lee (defendant), appeals his conviction based on a general jury verdict of guilty to murder in the first degree. His principal contention is that the statutory definition of extreme indifference murder, which was submitted to the jury for its consideration under the general verdict, is constitutionally infirm. We recently resolved the constitutionality of extreme indifference murder in *People v. Marcy*, Colo., 628 P.2d 69 (1981), and, on the basis of that decision, the defendant's conviction must be reversed. Although the defendant asserts several other claims in support of reversal,[1] we address only two of them. We conclude that the trial court's failure to suppress certain custodial statements made by the defendant to a police officer and prosecutorial misconduct occurring during the trial require a new trial. Accordingly we reverse and remand.

### I. The District Court Proceedings

The defendant, who was then 15 years old,[2] was charged by indictment with murder in the first degree after deliberation[3] as well as extreme indifference murder.[4] The charges arose out of the shooting death of William Larmore on October 2, 1978, in the city of Colorado Springs. Larmore was struck in the abdomen by a bullet while walking home from work. Prior to trial the defendant moved to suppress several custodial statements made by him as well as all derivative evidence obtained therefrom. The evidence at the suppression hearing established the following sequence of events which are pertinent to this appeal.

On October 2, 1978, the defendant was arrested by Officer Reeve of the Colorado Springs Police Department on an outstanding bench warrant for an unrelated matter.[5] After his arrest the defendant was transported to the Colorado Springs police station for standard "booking" procedures. During this process Officer Reeve learned about the Larmore shooting and realized that he had arrested the defendant very close to the location where the shooting occurred. Reeve had a prior contact with the defendant and considered him "street-

1. The defendant's claims which we find unnecessary to consider include: (1) the asserted denial of his right to a unanimous verdict due to the general verdict forms of guilty and not guilty to first degree murder, without specification of the particular type of murder committed, i. e., murder after deliberation or murder by extreme indifference; (2) the trial court's denial of his motion to suppress his statements on the ground that they were involuntary; and (3) the trial court's determination that it lacked jurisdiction under section 19-1-104(4)(c), C.R.S.1973 (1978 Repl. Vol. 8), to sentence the defendant as a juvenile or to remand the case to the juvenile court for disposition.

2. The defendant was charged as an adult pursuant to section 19-1-104(4)(b)(I), C.R.S.1973 (1978 Repl. Vol. 8), which provides that a child may be charged with the commission of a felony when he is alleged to have committed a crime of violence defined by section 18-1-105 as a class 1 felony and is fourteen years of age or older.

3. Section 18-3-102(1)(a), C.R.S.1973 (1978 Repl. Vol. 8).

4. Section 18-3-102(1)(d), C.R.S.1973 (1978 Repl. Vol. 8).

5. Officer Reeve contacted the defendant on September 29, 1978, in regard to a juvenile summons over some incident that occurred at Mitchell High School. The defendant was not a student at this school. Upon returning to the police station Reeve discovered that there was an outstanding bench warrant for the defendant's arrest. The record does not disclose the basis for the bench warrant.

wise". Not having a particular suspect, Reeve decided to question the defendant about the shooting. At approximately 6:30 p. m. on the evening of October 2, he asked the defendant, without any warning of rights, what he knew of the shooting. The defendant replied that he was familiar with it but was reluctant to become involved. Reeve then told him that any truthful information he provided would inure to his benefit in the matter for which he had been arrested. Upon further questioning the defendant told Reeve that he played football that afternoon at Van Diest Park with four other boys and that one of the boys, "Bug",[6] had claimed responsibility for the shooting. The defendant described the location where the gun had been concealed. Reeve informed his superior of this information and, pursuant to instructions, made an unsuccessful search for the weapon. Detective Gurule, who was also investigating the shooting, had earlier spoken to a witness who had seen a young black male similar in description to the defendant carrying a rifle case in the area of the shooting. Detective Gurule requested and obtained from Reeve a photograph of the defendant for the stated purpose of conducting a photo-lineup with this witness.

Officer Reeve was instructed to reinterview the defendant, who had been transferred to a juvenile detention center, and to obtain more specific information about the shooting. No warning of rights preceded the second interrogation. The defendant identified by name the individuals with whom he had played football that afternoon. Additionally, he stated that "Bug" gave him some .22 caliber bullets to dispose of and he threw them away at a location near the park where they played ball. The defendant again expressed reluctance to provide information but Officer Reeve assured him he would assist him in gaining release from his present confinement.

After this interrogation Officer Reeve returned to the police station. He there learned from Detective Gurule that a witness had made a photographic identification of the defendant as the young black male who had been seen in the area of the shooting earlier that afternoon. On the following day, October 3, 1978, Officer Reeve drove to the park and found the discarded bullets which the defendant mentioned in his previous statement.

On the afternoon of October 3 Officer Reeve questioned the defendant for a third time without any warning of rights. The officer gave the defendant a high school yearbook to examine for the purpose of selecting the photograph of "Bug". The defendant was unable to make a photographic identification but still insisted that "Bug" had shot the victim and the weapon was hidden in the area previously described by the defendant during his first interrogation by Officer Reeve. At the suppression hearing Officer Reeve testified that during all three interrogations he considered the defendant as a witness having possible information of the shooting and, therefore, believed it unnecessary to advise him of his constitutional rights. For the same reason the officer did not arrange for the defendant's parent to be present during the interrogations.[7] After the third interrogation a police captain informed Reeve that one of the persons previously named by the defendant had implicated the defendant in the shooting. Officer Reeve did not thereafter interrogate the defendant.

Further police investigation centered primarily on interviewing the persons mentioned by the defendant in his statements to Officer Reeve. It was determined that on October 2 the defendant and his friend, Jimmy Sanchez, burglarized an apartment and obtained three guns, including a shotgun. They fired the guns in a nearby field. Sanchez then went to the home of his aunt,

---

**6.** The police later determined that the defendant was known by the nickname "Bug".

**7.** After taking the defendant into custody on October 2, 1978, Officer Reeve made several unsuccessful attempts to contact the defend-

ant's father. Finally, on October 3 Reeve located the father and told him that the defendant was at the juvenile detention center, had provided information about the shooting, and would need an attorney if he became a suspect.

Kathy Johnson, where the defendant had been living. The defendant in the meantime went somewhere to hide the guns. Shortly after their separation the defendant arrived at the Johnson house with the weapons. He told Sanchez and some other friends who were there that he had just shot someone. The defendant and his friends then drove to Van Diest Park to play football. On the way the defendant admitted the shooting several times and at one point threw a handful of ammunition outside the car window. The police obtained a search warrant for Mrs. Johnson's home and recovered the weapon used in the shooting along with other rifles and ammunition.

The court denied the defendant's motion to suppress, ruling that the *Miranda* warnings were not required because Officer Reeve interrogated the defendant as a witness rather than as a suspect. For similar reasons the court held inapplicable to the defendant's interrogations section 19–2–102(3)(c)(I), C.R.S.1973 (1978 Repl. Vol. 8), which prohibits the admission of a child's statement unless the child's parent or an attorney acting in the child's behalf was present at such interrogation and the child and parent, if present, were advised of the child's constitutional rights.[8]

The case proceeded to a jury trial and the defendant's statements to Officer Reeve were admitted into evidence, as well as the bullets recovered by Reeve and the weapon seized from Mrs. Johnson's home. The prosecution also called as witnesses several persons named by the defendant in the course of his statements to Reeve. During the direct examination of the victim's wife, Donna Larmore, the prosecutor, over the defendant's objection, asked her what happened to her after her husband was pronounced dead at the hospital. She responded "Well, I felt sick, and I went home and miscarriaged my child." The court ordered the question and answer stricken, instructed the jury to disregard this testimony, and denied the defendant's motion for a mistrial.

It was the defendant's theory that the victim was shot accidentally by a ricocheting bullet fired by him in a field near the route Mr. Larmore was walking on his way home. The court submitted to the jury alternative verdict forms of murder in the first degree after deliberation or by extreme indifference. The lesser offenses of second degree murder,[9] reckless manslaughter,[10] and criminally negligent homicide[11] were also submitted to the jury. The jury returned a general verdict of guilty to murder in the first degree resulting in a sentence of life imprisonment.

## II. *Extreme Indifference Murder*

Since the defendant's conviction of first degree murder was by a general verdict after instructions on first degree murder after deliberation and first degree murder by extreme indifference, we are unable to determine which form of first degree murder is represented by the jury's verdict. Under these circumstances a constitutional infirmity in either form of first degree murder would require a reversal of the de-

---

8. Section 19–2–102(3)(c)(I), C.R.S.1973 (1978 Repl. Vol. 8) provides:

"No statements or admissions of a child made as a result of interrogation of the child by a law enforcement official concerning acts alleged to have been committed by the child which would constitute a crime if committed by an adult shall be admissible in evidence against that child unless a parent, guardian, or legal custodian of the child was present at such interrogation and the child and his parent, guardian, or legal custodian were advised of the child's right to remain silent, that any statements made may be used against him in a court of law, the right of the presence of an attorney during such interrogation, and the right to have counsel appointed if so requested at the time of the interrogation; except that, if a public defender or counsel representing the child is present at such interrogation, such statements or admissions may be admissible in evidence even though the child's parent, guardian, or legal custodian was not present."

9. Section 18–3–103(1)(a), C.R.S.1973 (1978 Repl. Vol. 8).

10. Section 18–3–104(1)(a), C.R.S.1973 (1978 Repl. Vol. 8).

11. Section 18–3–105(1)(a), C.R.S.1973 (1978 Repl. Vol. 8).

fendant's conviction. In *People v. Marcy, supra*, we recently held that the statutory definition of extreme indifference murder violates equal protection of the laws under Article II, Section 25, of the Colorado Constitution because that crime is not sufficiently distinguishable from second degree murder to warrant the substantial differential in penalty authorized by the statutory scheme. *Accord, People v. Gurule*, Colo., 628 P.2d 99 (1981); *People v. Curtis*, Colo., 627 P.2d 734 (1981). Accordingly, the defendant's conviction of murder in the first degree must be reversed.

■ The reversal of a conviction based on an offense that is constitutionally deficient as substantially indistinguishable from conduct proscribed by a less serious offense does not necessarily require a new trial. As we observed in *People v. Curtis, supra*:

"On prior occasions where all the elements of the lesser offense were proved by competent evidence and were included in the jury's verdict of guilty to the more serious but constitutionally infirm crime, we have vacated the conviction and remanded with directions to enter a judgment of conviction on the lesser offense and to resentence the defendant. *People v. Dominguez*, 193 Colo. 468, 568 P.2d 54 (1977); *People v. Horrocks*, 190 Colo. 501, 549 P.2d 400 (1976); *People v. Webb*, 189 Colo. 400, 542 P.2d 77 (1975); *People v. Bowers*, 187 Colo. 233, 530 P.2d 1282 (1974)."

However, such a disposition is not appropriate here because other errors mandate a new trial.

### III. *The Defendant's Statements and Derivative Evidence*

#### A.

In denying the defendant's motion to suppress, the trial court attached no significance to the custodial aspect of the interrogations which occurred during the two day period following the defendant's arrest but, instead, resolved the motion on the basis that the police during this period did not consider the defendant a suspect in the shooting. The trial court's ruling places an interpretation on *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that undercuts its rationale and nullifies the safeguards of section 19–2–102(3)(c)(I), C.R.S.1973 (1978 Repl. Vol. 8).

Briefly stated, the holding of the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–07, is that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates that the defendant has been adequately warned of his privilege against self-incrimination and his right to counsel and thereafter voluntarily, knowingly and intelligently waives those rights. The reason for the warning requirement is that, without such a safeguard, the compelling pressures inherent in police custody "work to undermine the individual's will to resist and to compel him to speak when he would not otherwise do so freely." *Miranda v. Arizona*, 384 U.S. at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719. These pressures can be virtually overwhelming in a case of a 15 year old youth. Such a person, no matter how sophisticated, "is not the equal to the police in knowledge and understanding of the consequences of . . . questions and answers" and "is unable to know how to protect his own interests or how to get the benefits of his constitutional rights." *Gallegos v. Colorado*, 370 U.S. 49, 54, 82 S.Ct. 1209, 1212, 8 L.Ed.2d 325, 328 (1962). For this reason section 19–2–102(3)(c)(I) of the Colorado Children's Code requires the presence of a parent, legal guardian, or attorney during the advisement of rights and any ensuing interrogation as an additional and necessary assurance that the privilege against self-incrimination will be fully afforded to the juvenile. *E.g., People v. Saiz*, Colo., 620 P.2d 15 (1980); *People v. Maes*, 194 Colo. 235, 571 P.2d 305 (1977).

Under *Miranda*, therefore, the decisive stage for the warnings is custodial interrogation. Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Mi-*

*randa v. Arizona,* 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. There is no dispute here that the defendant was in police custody. *See Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). The People seek to justify noncompliance with *Miranda* and section 19–2–102(3)(c)(I) by arguing that the defendant was not an actual suspect at the time of the interrogation and, therefore, he was not interrogated within the intended sense of *Miranda.* We reject this argument as legally unsound.

 The privilege against self-incrimination "not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence . . . ." *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124 (1951); *accord, e. g., Leary v. United States,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Interrogation occurs when the police use words or engage in actions that are reasonably likely to evoke an incriminating response from the defendant. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *People v. Lowe,* Colo., 616 P.2d 118 (1980). The critical inquiry in this case is not whether the police considered the defendant a suspect but, rather, whether the defendant, while in police custody, was exposed to a risk of self-incrimination by police interrogation. *See, e. g., Marchetti v. United States,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Rogers v. United States,* 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951).

Prior to the first interrogation there was no clearly identifiable suspect and Officer Reeve surmised that the defendant might know something about the shooting. The first interrogation resulted in the defendant admitting his knowledge of the shooting, including the location of the weapon. Prior to the second interrogation the police had been informed that the defendant resembled the description of a young black male who was seen carrying a rifle case in the area of the shooting. During the second interrogation the defendant implicated himself further in the shooting by admitting that he disposed of bullets at the request of "Bug". Prior to the third interrogation the defendant actually had been identified by photograph as the young black male present in the area of the shooting when it occurred. During this last interrogation the defendant repeated his earlier statements about his knowledge of the shooting and the location of the weapon. Never having been advised of his absolute right to decline to answer any questions, the defendant's opportunity to exercise this right was illusory while, at the same time, his exposure to the risk of actual incrimination was continuous.

 Reduced to its basic components, the People's argument amounts to an attempt to engraft on *Miranda* a focus-requirement that would reduce to constitutional insignificance the critical relationship between police custody and the privilege against self-incrimination. In *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), where the defendant while incarcerated under a state sentence was interrogated by federal officers, the Supreme Court rejected the government's contention that the *Miranda* holding applies "only to questioning one who is 'in custody' in connection with the very case under investigation":

> "There is no substance to such a distinction, and in effect it goes against the whole purpose of the *Miranda* decision which was designed to give meaningful protection to Fifth Amendment rights. We find nothing in the *Miranda* opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody." *Id.* at 4–5, 88 S.Ct. at 1505, 20 L.Ed.2d at 385.

*See, e. g., Wade v. Mancusi,* 358 F.Supp. 103 (W.D.N.Y.1973) (*Miranda* warnings required prior to interrogation where defendant in custody for offense other than that under investigation); *Carter v. McGinnis,* 351 F.Supp. 787 (W.D.N.Y.1972) (*Miranda*

warnings required where defendant incarcerated and interrogation related to prison disciplinary matter that arguably could result in criminal prosecution).[12] For purposes of *Miranda*, there is no basis to attribute any greater constitutional significance to the level of police suspicion toward a defendant already in custody than the significance attributed to the reason why he is in custody. Neither the absence of police suspicion nor the precise basis for custody affects in the least the principle that "[u]nder *Miranda*, a person in police custody has ... an absolute right to decline to answer any question...." *United States v. Mandujano*, 425 U.S. 564, 581, 96 S.Ct. 1768, 1778, 48 L.Ed.2d 212, 225 (1976). We believe *Miranda's* prophylactic standards, as well as the safeguards of section 19–2–102(3)(c)(I), were intended to apply to this defendant's custodial situation by affording him a full opportunity to exercise his privilege against self-incrimination in a knowing and intelligent manner.

The logic of the People's argument would subject one in police custody to unlimited interrogation on any crime, without any warning of basic constitutional rights, so long as the focus of suspicion had not yet settled on the person interrogated. We reject such an argument as contrary to the basic purpose of the *Miranda* decision and,

in the case of juveniles, as inimical to the statutory protections contemplated by section 19–2–102(3)(c)(I). The trial court erred in denying the defendant's motion to suppress his three custodial statements made on October 2 and October 3.[13]

### B.

The defendant moved to suppress not only his custodial statements but also the fruits of those interrogations, including any real evidence derived directly therefrom and the testimony of witnesses whose names were furnished by the defendant during the interrogations. Having found no *Miranda* violation the trial court never considered the application of the derivative evidence rule to these separate evidentiary items.

Once it is determined that a statement was improperly obtained in violation of *Miranda*, not only must the statement be suppressed but also evidence subsequently acquired may be suppressible as the fruit of the illegal interrogation. *E.g., Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); *People v. Founds*, Colo., 621 P.2d 325 (1981); *People v. Saiz, supra; People v. Lowe, supra.* In situations involving successively invalid statements by a defendant or real evidence derived from an unlawful interrogation, the derivative evidence rule generally requires the prose-

**12.** In support of the argument that *Miranda* should be restricted to custodial defendants who are the focus of police suspicion for the crime under investigation, the People cite *People v. Gladney*, 194 Colo. 68, 570 P.2d 231 (1977); *People v. Downer*, 192 Colo. 264, 557 P.2d 835 (1976); and *People v. Thornton*, 190 Colo. 397, 547 P.2d 1278 (1976). In each of these cases, however, the interrogation took place before the defendant was arrested and the defendant simply was not in the custodial situation contemplated by *Miranda. See Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

**13.** We do not address the defendant's claim that his statements should have been suppressed as involuntary. The trial court concluded that the *Miranda* warnings were not applicable to the successive interrogations on October 2 and 3, and, therefore, it never reached the question of what effect the failure

to warn had on the issue of voluntariness. "[The fact] that a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation, as is now required by *Miranda*, is a significant factor in considering the voluntariness of statements later made." *Davis v. North Carolina*, 384 U.S. 737, 740, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895, 898 (1966). Since the trial court must conduct a new hearing on the derivative evidence issue, *see* Part III B, *infra*, it can determine at that same hearing whether, in spite of the failure to warn and the alleged promises of assistance by Officer Reeve, the defendant's statements were voluntary in the constitutional sense—that is, the product of a rational intellect and a free will. *E.g., Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Only if the defendant's statements satisfy appropriate legal standards of voluntariness may they be used for impeachment purposes at trial. *E.g., Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

cution to establish that the challenged evidence was obtained from an independent source, or that the connection between the initial illegality and the evidence has become so attenuated as to dissipate the initial taint. *E.g, People v. Founds, supra; People v. Lowe, supra.*

Additional considerations are applicable to this case, where the alleged fruit of the *Miranda* violation is the trial testimony of witnesses whose identities were disclosed in the course of an unlawful interrogation of the defendant. The source of trial testimony often lies in the free choice of the witness to give evidence in the case. "Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition." *United States v. Ceccolini,* 435 U.S. 268, 276, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268, 277 (1978). It is not unreasonable to assume that under ordinary circumstances the decision of a witness to testify will arise from an independent source unrelated to the official misconduct. Even where the road between the constitutional violation and the witness is direct, there well might be sufficient attenuation to permit the witness to testify.[14] "[T]he degree of free will necessary to dissipate the taint will very likely be found more often in the case of live witness testimony than other kinds of evidence." *United States v. Ceccolini,* 435

U.S. at 276–77, 98 S.Ct. at 1060, 55 L.Ed.2d at 277. As an alternative to a showing of independent source or sufficient attenuation the prosecution might be able to demonstrate, as a basis for admission, that the witnesses and their testimony inevitably would have been discovered in the normal course of police investigation. *E.g., United States v. Seohnlein,* 423 F.2d 1051 (4th Cir. 1970), *cert. denied,* 399 U.S. 913, 90 S.Ct. 2215, 26 L.Ed.2d 570 (1970); *Wayne v. United States,* 318 F.2d 205 (D.C.Cir.1963), *cert. denied,* 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963).

The trial court on remand should apply these principles to the challenged evidence and, in accordance with the derivative evidence rule, make appropriate determinations of admissibility.

## IV. *Prosecutorial Misconduct*

The infirmity in the trial proceedings was exacerbated by the prosecutor's elicitation of prejudicial and totally irrelevant evidence of the miscarriage suffered by the victim's wife, Mrs. Larmore, upon her husband's death. The trial court's cautionary instruction to the jury is not sufficient under these circumstances to offset the inflammatory nature of this testimony and its likely effect on the jury's deliberations. There are some cases "in which the risk that the jury will not, or cannot, follow instructions is so great and the consequences of failure so vital to the defendant, that the practical and human limitations of

---

14. In *Michigan v. Tucker,* 417 U.S. 433, 435, 94 S.Ct. 2357, 2359, 41 L.Ed.2d 182, 187 (1974), the Supreme Court addressed the question "whether the testimony of a witness in respondent's state court trial for rape must be excluded simply because police had learned the identity of the witness by questioning respondent at a time when he was in custody as a suspect, but had not yet been advised that counsel would be appointed for him if he was indigent." The interrogation took place prior to the court's decision in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but the trial occurred after *Miranda* and that decision was applicable to the trial. After noting that the interrogating officers were "focusing on the suspect's opportunity to have retained counsel with him during the interrogation if he chose to do so," as established in *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d

977 (1964), the Court held that the testimony of the witness should not have been excluded:

"The statements actually made by respondent to the police, as we have observed, were excluded at trial in accordance with *Johnson v. New Jersey,* 384 U.S. 719, [86 S.Ct. 1772, 16 L.Ed.2d 882] (1966). Whatever deterrent effect on future police conduct the exclusion of those statements may have had, we do not believe it would be significantly augmented by excluding the testimony of the witness Henderson as well." 417 U.S. at 447–48, 84 S.Ct. at 2365, 41 L.Ed.2d at 195.

The principal factors on which the Court seemed to rely were the apparent good faith of the officers in conducting the interrogation, the voluntary character of the statement, and the tenuous relationship between the high cost of excluding the trial testimony of the witness and the deterrent purposes of the exclusionary rule.

the jury system cannot be ignored." *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476, 485 (1968). This being such a case, the defendant's motion for a mistrial should have been granted.

The record discloses that defense counsel unsuccessfully objected to the prosecutor's attempt to establish the general physical condition of Mrs. Larmore on the day of the shooting. After eliciting testimony that she was four months pregnant on that day, the prosecutor then questioned her, over the defendant's objection, about learning of her husband's death and concluded his direct examination with the testimony about her miscarriage. In the context of this record it strains credulity to view the elicitation of this testimony as the product of inadvertence or mistake. Considering its patent irrelevancy to the charges and its vast potential for prejudice, we view the presentation of this testimony as a thinly veiled effort to evoke the jury's sympathy for the witness due to her loss of husband and child. Whether the prosecutor also sought by this testimony to instill in the jury's mind an ill will toward the defendant we cannot determine. Whatever the prosecutor's other motives may have been, the natural and probable consequence of such testimony was to portray the defendant to the jury as the person who not only shot the victim but also caused the death of his unborn child, a matter for which he had not been charged.[15]

Unfortunately, this is not the first time we have confronted a record depicting prosecutorial misconduct by the office of the District Attorney for the Fourth Judicial District. In *People v. Ferrell*, Colo., 613 P.2d 324 (1980), this same prosecutor in summation during a murder trial implored the jury to retaliate against the defendant by finding him guilty. We noted that his statements "exceeded the bounds of proper argument and therefore cannot be condoned." Colo., 613 P.2d at 326. In *People v. Estep*, 196 Colo. 340, 583 P.2d 927 (1978), we voiced strong disapproval of the district attorney's cross-examination of a defense witness in a manner that manifested the prosecutor's personal belief in the defendant's guilt. What we stated in *People v. Goldsberry*, 181 Colo. 406, 411, 509 P.2d 801, 804 (1973), is especially pertinent to the prosecutor's conduct in this case:

"It appears from the record of this case that the district attorney was fully cognizant that the prosecution witness would respond in the manner [s]he did and thus, expose to the jury inadmissible and highly prejudicial evidence. His conduct in this regard is not to be condoned. This court has repeatedly held that the duty of a prosecutor is not merely to convict, but also to see that justice is done by seeking the truth by the presentation of proper evidence. Where the prosecutor's zeal to win a case involves a clear lack of adherence to the elementary principles of fairness and legality, it can only be condemned."

A repeated pattern of overzealous prosecutorial tactics will not be tolerated. The trial court must not hesitate to impose effective and severe sanctions, if necessary, should there be a recurrence of the type of misguided zeal that eroded the fairness of the first trial. *See People v. Elliston*, 181 Colo. 118, 508 P.2d 379 (1979); *People v. Walker*, 180 Colo. 184, 504 P.2d 1098 (1973); I *ABA Standards For Criminal Justice, The Prosecution Function*, Standard 3–5.6 (2d ed. 1980).

The judgment is reversed and the cause is remanded for a new trial, in accordance with the views herein expressed, on murder after deliberation[16] and any less-

---

15. On October 2, 1978, prior to the shooting, Mrs. Larmore had been sick and telephoned her husband at his job, asking him to come home and take her to the hospital. The shooting occurred while the husband was returning home in response to this phone call.

16. The jury's general verdict of guilty to first degree murder did not constitute an implied acquittal of murder after deliberation. Both murder after deliberation and extreme indifference murder were submitted to the jury as alternatives. Under the statutory scheme first degree murder by extreme indifference carries the same penalty as murder after deliberation

er offenses that appropriately might be submitted to the jury on retrial.

and neither crime is a lesser included offense of the other. *People v. Curtis,* Colo., 627 P.2d 734 (1981); *see also People v. Gurule,* Colo., 628

P.2d 99 (1981). Therefore, there is no impediment to the retrial of the defendant for murder after deliberation.