STATE OF CONNECTICUT *v.* EDWARD FALBY

SPEZIALE, C. J., PETERS, HEALEY, ARMENTANO and SHEA, Js.

Argued January 12—decision released May 4, 1982

*Richard T. Meehan, Jr.,* with whom, on the brief, was *Kathleen M. VanDerAue,* law student intern, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Eugene J. Callahan,* assistant state's attorney, for the appellee (state).

PETERS, J.   This appeal from a conviction for murder questions the validity of a confession obtained from a suspect with regard to a crime entirely unrelated to the crime for which he was

arrested. The defendant, Edward Falby, was arrested on a warrant for third degree burglary in violation of General Statutes § 53a-103 and subsequently confessed to murder in violation of General Statutes § 53a-54a (a). He claims error in the trial court's denial of a motion to suppress his confession, in various evidentiary rulings, and in jury instructions.

The events surrounding the defendant's confession are substantially undisputed and were set forth by the trial court in a lengthy finding of facts. On June 10, 1978, the defendant was arrested in Westport during the commission of a burglary and was scheduled for arraignment on a charge of burglary in the third degree before the Court of Common Pleas on June 20, 1978. A local attorney, Jerrold Engelman, agreed to represent the defendant at his arraignment subject to payment of a retainer on the 20th; Engelman did not enter an appearance for the defendant until June 19.

On June 13, 1978, the body of a nine year old girl was discovered in a wooded area approximately one quarter of a mile from the defendant's home. A child who had walked through the area earlier in the afternoon described to the police an encounter with a slender, red-haired young man, and a composite drawing of the suspect appeared in local newspapers. On June 16 the child identified the defendant from a photo display as the young man he had spoken to. The defendant at that time was eighteen years old and had red hair.

Following this identification, Lieutenant William Smith of the Westport police department and

Inspector Ernest Draper of the state's attorney's office obtained two warrants: a bench warrant for the defendant's arrest on the third degree burglary charge and a search and seizure warrant for the defendant and his home in relation to the murder investigation. Together with a sizable contingent of police officers, Smith and Draper proceeded to the defendant's home late in the afternoon of June 16; Smith had a tape recorder in his pocket and recorded his conversations with the defendant and his family. The defendant was not at home when the police arrived but was arrested shortly thereafter outside the house and twice informed of his *Miranda* rights before reaching the police station, where he was again informed of his rights. The defendant did not enter his home and was not shown the search and seizure warrant, although a copy was left with Barbara Falby, the defendant's mother.

At the Westport police station the defendant was questioned by Smith and Draper from approximately 5:45 p.m. to 7 p.m., until the arrival of attorney Michael Cantore, who had been sent to police headquarters by Barbara Falby. In the course of his interrogation the defendant confessed to killing the nine year old girl, and that confession was recorded on tape; the defendant did not subsequently sign a written statement. The defendant was arrested on a bench warrant for murder at approximately 10 p.m. that night and taken to the Bridgeport Correctional Center at approximately 11:30 p.m., where a corrections officer once again advised the defendant of his rights pursuant to General Statutes § 54-43. At his jury trial for murder, the defendant's confession was, over his objection, admitted in evidence.

The defendant's principal claim of error on appeal is the denial of his motion to suppress his confession. He bases that claim on several grounds: the failure of the police to inform him that he was a murder suspect; the absence of counsel during interrogation; improper police tactics in arresting the defendant for an unrelated crime and promising him psychiatric help in return for a murder confession; and technical errors in obtaining the burglary warrant and executing the murder warrant. The defendant also raises two additional evidentiary claims of error: that the trial court erred (1) in admitting the testimony of a young girl concerning an attack on her by the defendant a year prior to the murder and (2) in failing to exclude expert testimony tainted by a violation of the court's sequestration order. Finally, the defendant claims error in the trial court's jury instructions because the court (1) explained to the jury that the state was not seeking capital punishment but failed to explain the consequences of a verdict of not guilty by reason of insanity; (2) rejected the defendant's proposed instruction on two lesser included offenses; and (3) instructed the jury improperly concerning the defendant's decision not to testify at his trial. We find error only in the trial court's instruction on lesser included offenses but will review those of the defendant's other claims that may arise again upon a retrial.

## I

The defendant's first claim of error concerning the admissibility of his confession argues that the principles of *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), require the suppression of his confession because he was not

told, at the time when he was apprised of his *Miranda* rights, that he was suspected of the crime of murder. The trial court, in its memorandum of decision denying his motion to suppress, held, as a matter of law, that *Miranda* v. *Arizona* does not require the police to inform a defendant of the exact nature of the charges against him; the court furthermore found, as a fact, that the defendant knew, at the time of his arrest, that he was a prime suspect in the Westport murder.

The principles of *Miranda* v. *Arizona* are well established and undisputed. In order to assure that a confession is voluntary, and to protect a suspect's constitutional privilege against self-incrimination,[1] the police are obligated to observe certain formalities before attempting to elicit a confession from a suspect who is in custody. *Miranda* v. *Arizona,* supra, 478–79;[2] *State* v. *Stankowski,* 184 Conn. 121, 136, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981); *State* v. *Derrico,* 181 Conn. 151, 161, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). The defendant

---

[1] The fifth amendment to the United States constitution provides that no person "shall be compelled in any criminal case to be a witness against himself . . . ." The constitution of Connecticut, article first, § 8, provides that "[n]o person shall be compelled to give evidence against himself . . . ."

[2] "To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that

does not deny that he was given the requisite *Miranda* warnings immediately upon his arrest on the burglary warrant.[3] He maintains, however, that the police were, in addition, obligated to inform him that, although he was under arrest for burglary, he was a prime suspect in, and would be interrogated about, the Westport murder. When the burglary arrest was, as he alleges, a mere pretext for the murder interrogation, he argues that *Miranda* requires disclosure of the police agenda before a waiver of *Miranda* rights can be knowing and intelligent. *Miranda* v. *Arizona, supra,* 475.

The record in this case, which includes a complete transcript of all conversations between the police and the defendant from the moment of his arrest to the arrival of Attorney Cantore, lends considerable support to the defendant's allegation that his arrest for burglary was indeed unrelated to the custodial interrogation which followed. The record reveals a striking and sustained reluctance on the part of the police to articulate the subject of their concern. Repeatedly, the police evaded the

---

if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Miranda* v. *Arizona,* 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] The trial court found that the defendant was advised of his *Miranda* rights by Youth Officer Stephen Smith on the street outside the defendant's home at the time of his arrest for third degree burglary, by Lieutenant William Smith in the car en route to police headquarters, and by Lieutenant Smith again upon arrival at headquarters. The first two warnings were recorded, but the third was not. The defendant does not, however, dispute the number, timing, or substance of these warnings.

defendant's specific inquiries about why he was being taken into custody and questioned.[4] At the hearing on the motion to suppress, Officers Smith and Draper testified that the defendant was never directly informed that he was a murder suspect. They further testified that their reason for requesting a burglary bench warrant was concern that the defendant would flee the jurisdiction once the search warrant alerted him to police suspicion about his involvement in the murder. Draper testified that at the time of the initial arrest he did not believe that he had sufficient evidence for a murder warrant. Another police officer testified, without contradiction, that the authorities had no need for further questioning about the burglary because they already possessed sufficient evidence against the defendant. There was also testimony by the police, amply confirmed by the transcript of the defendant's interrogation, that in fact he was asked no questions about the burglary. In light of this testimony, it is impossible to resist the conclusion that the burglary bench warrant was a convenient pretext for custodial interrogation of the defendant

---

[4] On first reaching the Falby home, Lieutenant Smith explained that the officers accompanying him were there to execute a search warrant on "another matter," one "entirely different" from the burglary bench warrant. Although the defendant's mother expressed anxiety that the police might be there because of the recent murder, no attempt was made to confirm or deny her suspicion. When the defendant arrived, this scenario was repeated. The defendant asked, "Is this warrant for what happened last week?" and Smith replied, "The warrant is for the—what happened last week regarding the— what'd you do last week?" When the defendant asked why a warrant had been issued for him, Smith responded, "Well, I'll explain that other situation to you when we get to headquarters, okay?" At headquarters, the defendant indicated that he had "ideas" about the reason for his custody and Smith again promised "We'll talk about that, your ideas or whatever." No such discussion ensued; instead, Smith told the defendant that his mother was concerned "on account of what's been in the papers" and "that's why."

concerning a murder, at a time when inadequate grounds existed to arrest him for the more serious crime.

It is clear that the guidelines of *Miranda* do not, per se, limit police interrogation to the crime with which a suspect has been explicitly charged. Ordinarily, *Miranda* warnings permit the police to extend their questioning of one who is in custody to include crimes other than the very case under investigation. See *Michigan* v. *Mosley,* 423 U.S. 96, 104–105, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975); *Mathis* v. *United States,* 391 U.S. 1, 4–5, 88 S. Ct. 1503, 20 L. Ed. 2d 381 (1968). Good faith inquiry into the possible commission of one crime may legitimately unearth grounds for pursuing evidence of guilt for another crime. We are asked today to rule whether these principles permit the police deliberately to withhold from a suspect, at the time of issuing the *Miranda* warnings, the nature of the sole crime on which they intend to focus their interrogation.

The circumstances of the present case do not present an appropriate opportunity for deciding the extent to which the police have a duty to inform a suspect of the true subject of their intended interrogation. We recognize that this is an issue on which the case law is divided. For cases denying the existence of such a duty, see *United States* v. *Anderson,* 533 F.2d 1210, 1212 n.3 (D.C. Cir. 1976); *Collins* v. *Brierly,* 492 F.2d 735, 738–39 (3d Cir. 1975), cert. denied, 419 U.S. 877, 95 S. Ct. 140, 42 L. Ed. 2d 116 (1974); *United States* v. *Campbell,* 431 F.2d 97, 99 n.1 (9th Cir. 1970); *State* v. *Carter,* 296 N.C. 344, 352–53, 250 S.E.2d 263 (1979) and cases cited therein; contra, see *United States* v.

*McCrary,* 643 F.2d 323, 328 (5th Cir. 1981) ; *Schenk* v. *Ellsworth,* 293 F. Sup. 26, 28–29 (D. Mont. 1968) ; *Commonwealth* v. *Dixon,* 475 Pa. 17, 22–23, 379 A.2d 553 (1977) ; cf. *People* v. *Lee,* 630 P.2d 583, 589–90 (Colo. 1981) ; see generally White, "Police Use of Trickery in Inducing Confessions," 127 U. Pa. L. Rev. 581, 611–14 (1979) ; Dix, "Mistake, Ignorance, Expectation of Benefit, and the Modern Law of Confessions," 1975 Wash. Univ. Law Q. 275, 318–21. Adequate disclosure is one element of the requirement that a confession is "the product of an essentially free and unconstrained choice by its maker." *State* v. *Derrico,* 181 Conn. 151, 163, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980), quoting *Culombe* v. *Connecticut,* 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961) ; see *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). The word "murder" spoken by a police officer is often a potent stimulant to the exercise of such constitutional rights as the right to counsel and the protection against self-incrimination. Justice Stewart has written of "society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness . . . ." *Schneckloth* v. *Bustamonte,* supra, 225. This court too has only in recent days condemned unfair police procedures, when we held that *"Miranda* inhibits not only police encounters of the third degree kind, it also precludes all types of questioning and psychological ploys, calculated or reasonably likely to produce the desired result. Interrogation extends to any words or actions on the part of police officers that they should know are reasonably likely to elicit an incriminating response. *Rhode Island* v. *Innis,* 446 U.S. 291, 301–302, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)." *State* v. *Graham,* 186 Conn. 437, 443,

441 A.2d 857 (1982). The police had no duty, however, to disclose to the defendant what he actually knew.

The trial court found, as a matter of fact, that the defendant had actual knowledge that he was a prime suspect in the Westport murder. The overall issue of whether a confession is voluntary and admissible under the fifth amendment is a question of fact "for determination by the trial court in the exercise of its legal discretion. . . . in accordance with constitutional standards of due process. *State* v. *Staples,* 175 Conn. 398, 408, 399 A.2d 1269 (1978)." *State* v. *Derrico,* supra, 162–63; see *State* v. *Devine,* 149 Conn. 640, 652, 183 A.2d 612 (1962).

The transcript supports the trial court's factual determination. At the hearing on the motion to suppress, there was testimony concerning the publication in local newspapers, prior to the defendant's arrest, of a composite sketch of the murder suspect together with a description of a slender, red-haired young man. Barbara Falby testified that on June 15 the defendant had decided to speak to a police detective about the investigation but was dissuaded by her. This testimony, added to the defendant's own observation to the police that he had "ideas" about the reason for his arrest, adequately supports the trial court's finding of actual knowledge.

Since the defendant had sufficient knowledge of his actual situation at the time of his *Miranda* warnings, he was not misled by the failure of the police to disclose to him their intention to interrogate him about the murder. In these circumstances, the nature of the *Miranda* warnings that he received did not render the confession involuntary or its admission into evidence improper.

The defendant also claims that his confession should have been suppressed because it was obtained in the absence of counsel. Two bases for this claim are urged: that the defendant was at the time of interrogation already represented by counsel retained earlier in relation to the burglary charge, and that the police were aware of Barbara Falby's strenuous efforts on behalf of her son to contact an attorney following the arrival of police officers at her home. In light of these facts, the defendant argues, the state has not met its burden of demonstrating the defendant's waiver of his sixth amendment right to counsel.

Although the record does not conclusively establish Attorney Engelman's representation of the defendant on the burglary charge at the time of his murder confession and the trial court made no relevant finding of fact, we need not resolve that question today. This court has recently held that "[t]he fact that the defendant had been represented by counsel in a different proceeding did not . . . give notice to the police than an appearance had been entered by the defendant's counsel in connection with the charges then under investigation." *State* v. *Derrico,* supra, 168. Thus, even if Engelman's appearance for the defendant on the burglary charge had been entered prior to June 16, that appearance would in no way undermine an otherwise valid waiver of right to counsel for the murder interrogation. See *State* v. *Wilson,* 183 Conn. 280, 283–86, 439 A.2d 330 (1981); *State* v. *Moscone,* 171 Conn. 500, 510, 370 A.2d 1030 (1976). Finally, we note that since the defendant was eighteen years old at the time of his confession, his mother's efforts to secure counsel for him could not neutralize his own valid waiver of

rights. See General Statutes § 1-1d. In these and all other respects, there was therefore sufficient evidence to support the trial court's finding of fact that the defendant had waived his right to counsel.

The defendant's next claim for suppression rests upon the police strategy of promising him psychiatric help in return for a confession. Such promises made to a young man whom the police knew to have a troubled psychiatric history, the defendant argues, fatally weaken the voluntariness of his confession.

The transcript of the defendant's police interrogation supports the trial court's finding that "Lieutenant Smith's approach was that of a 'Father Confessor' " urging on the defendant the beneficial consequences of a full confession. The transcript also, however, supports the trial court's further findings that no actual promises were made by the police and that the defendant's capacity for decision-making was not impaired by this method of interrogation. On the record before us we cannot say that the trial court's findings of voluntariness are clearly erroneous.

The defendant's final claims of error in the admission of his confession involve alleged procedural breaches by the authorities. First, the defendant objects that since he received no *Miranda* warnings from a judge of the Court of Common Pleas on the occasion of his June 10 warrantless burglary arrest as required by General Statutes § 54-1b, all subsequent confessions are barred by General Statutes § 54-1c. It is true that the latter statute renders inadmissible the confession of any suspect "who has not been informed of his rights

as provided by section 54-1b or section 54-64b." It is also true, however, and dispositive, that the defendant's Superior Court bench warrant arrest for burglary on June 16, which transferred jurisdiction from the Court of Common Pleas and thus superseded the prior arrest, was followed by adequate and valid *Miranda* warnings.

The defendant next charges violation of General Statutes § 54-43,[5] which at the time of his arrest authorized the issuance of a bench warrant "[u]pon the representation of any state's attorney that he has reasonable ground to believe that a crime has been committed within his jurisdiction." First, he argues, the warrant for the defendant's arrest was obtained by Assistant State's Attorney Richard Jacobson rather than by State's Attorney Donald Browne. Second, the representation was not made under oath as required by statute.

The defendant's first objection fails because an assistant state's attorney "in the absence from the county or district or disability of the state's attor-

---

[5] At the time of the defendant's arrest, General Statutes § 54-43 provided as follows: "Sec. 54-43. BENCH WARRANT. PROCEDURE ON ARREST. Upon the representation of any state's attorney that he has reasonable ground to believe that a crime has been committed within his jurisdiction, the superior court or, when said court is not in session, any judge thereof, may issue a bench warrant for the arrest of the person or persons complained against, and in such case shall, except in cases punishable by death or life imprisonment, fix a bond for the appearance of such person or persons in such amount as to said court or to such judge appears reasonable. When any person is arrested on a bench warrant issued by order of the superior court or, when said court is not in session, by a judge thereof, the officer or indifferent person making such arrest shall without undue delay bring such person before the clerk or assistant clerk of the superior court for the county or judicial district where such warrant was issued, during the office hours of such clerk and if such clerk's office is not open, such officer or indifferent person shall, without undue delay, bring such person to a community cor-

ney or at his request, shall have and exercise all the powers and perform all the duties of state's attorney." General Statutes § 51-278. The trial court expressly found that on the afternoon of June 16 Donald Browne was out of the judicial district of Fairfield County, and that finding is adequately supported by the record. The defendant's second objection, the lack of an oath, is fully answered by our decision in *Grega* v. *Warden,* 178 Conn. 207, 210, 423 A.2d 873 (1979), where we held that an application by a state's attorney for a bench warrant may be supported by either an oath or an affirmation. See *State* v. *Licari,* 153 Conn. 127, 132, 214 A.2d 900 (1965).

The defendant's final claim for suppression is based on the time that elapsed between his initial arrest at approximately 5:20 p.m. and his appearance before an official of the Bridgeport Correctional Center at approximately 11:30 p.m. Under General Statutes § 54-43, any person arrested on a bench warrant must be taken "without undue

rectional center within the county or judicial district where such warrant was issued or, if there is no such correctional center within such county or judicial district, to the nearest community correctional center and said clerk or assistant clerk or such person designated by the commissioner of correction shall thereupon advise such person that he has a right to retain counsel, that he has a right to refuse to make any statement, and that any statement he makes may be introduced in evidence against him, and shall order such person to enter into a recognizance with surety to the state in such sum as said court or such judge has fixed conditioned that such accused person shall appear before the superior court having criminal jurisdiction then in session or next to be held in and for the county or judicial district where such bond is required, to answer to the bench warrant and information filed in such case; and on his failure to enter into such recognizance or if the offense charged in such bench warrant and information is not bailable, such clerk or assistant clerk or such person designated by the commissioner of correction shall issue a mittimus committing such person to a community correctional center until he is discharged by due course of law."

delay" before the clerk of the Superior Court or, in the event that the clerk's office is closed, before a designated official at a community correctional center, to be advised of his rights. The defendant does not challenge the authority of the official who acted; he claims only that the six-hour delay between arrest and advice constitutes undue delay under § 54-43, and so requires exclusion of his confession.

In its findings of fact, the trial court set forth a timetable for the afternoon and evening of June 16. According to that timetable, the defendant spent the hour from approximately 7 p.m. to 8 p.m. in conversation with Attorney Cantore. He spent the time from approximately 10 p.m. to 10:30 p.m. being photographed and fingerprinted at police headquarters in Westport; the drive from Westport to Bridgeport took an additional half hour. The defendant does not dispute these times. Of the six hours between arrest and arrival at the correctional center, then, two hours were consumed in related and reasonable activities. We cannot say, as a matter of law, that the remaining four hours, during which time the authorities obtained and executed a bench warrant for murder, constitute an undue delay. The fact that other arrangements might have been made to accelerate the defendant's progress does not by itself establish a statutory violation.

## II

The defendant also claims error in the trial court's admission of testimony by a fourteen year old girl concerning an attack on her by the defendant one year prior to the murder. There are two bases for this claim: (1) that the state did not offer clear and convincing proof of the defendant's guilt

for the attack, and (2) that the witness' in-court identification of the defendant was fatally tainted by a photo display ruled impermissibly suggestive by the trial court.

At a hearing on the defendant's motion to suppress, the witness testified that on June 27, 1977, she was walking her bicycle through a wooded area not far from the murder site when a young man approached her. After initiating a conversation and giving his name as "something like Holby or Folby," the young man began to help her with her bicycle. When the witness resisted his efforts to help, he "grabbed me around the neck and began to choke me." As the witness struggled, she and her attacker heard footsteps approaching. The attacker then threw her to the ground and ran off. On the evening of the crime the witness was unable to identify her attacker from a display of nine black and white photographs, including a recent photograph of the defendant. The witness did not recall seeing a bandage on the attacker's wrist, although there was testimony that the defendant wore such a bandage at that time. A year later, following the murder, the police returned with seven of the previous photographs and a new photograph of the defendant in place of the earlier one; the witness then identified the defendant as her attacker. She also subsequently identified the defendant in court. There was independent testimony by another witness, a friend who had been living with the Falby family at the time of the first attack, that the defendant had described to her an occasion on which "he was walking home from Norwalk through a path and there was a little girl on the path with a bicycle and he just had the urge to take her around the neck" and in fact did so.

In ruling on the motion to suppress, the trial court found clear and convincing evidence that the defendant had attacked the witness. It further found that the strong similarities between that attack and the circumstances of the murder rendered the disputed testimony probative on the issue of intent. Although the court rejected the 1978 photo identification as impermissibly suggestive, it found that the witness' in-court identification was based upon independent observation and so was admissible. At trial, over the defendant's objection, the witness testified to his attack upon her.

This court has recently provided a succinct statement of our law on the admission of evidence of prior crimes by a defendant. "As a general proposition, evidence of guilt of other crimes, because of its prejudicial nature, is inadmissible to prove that a defendant is guilty of the crimes with which he is charged. *State* v. *Holliday,* 159 Conn. 169, 172, 268 A.2d 368 (1970) ; *State* v. *Harris,* 147 Conn. 589, 599, 164 A.2d 399 (1960). Such evidence is admissible for other purposes, however, such as when it is particularly probative in showing such things as intent, an element in the crime, identity, malice, motive or a system of criminal activity, to name some exceptions to the rule. *State* v. *Brown,* 169 Conn. 692, 701, 364 A.2d 186 (1975). The trial judge, however, must determine in the exercise of judicial discretion that its probative value outweighs its prejudicial tendency. *State* v. *Moynahan,* [164 Conn. 560, 597, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973)] ; *State* v. *Holliday,* supra, 173. Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. *State* v. *Hauck,* 172 Conn. 140, 144, 374 A.2d 150 (1976) ;

*Thomas* v. *Thomas,* 159 Conn. 477, 480, 271 A.2d 62 (1970); 1 Wharton, Criminal Evidence (13th Ed.) § 241." *State* v. *Turcio,* 178 Conn. 116, 129, 422 A.2d 749 (1979); see *State* v. *McCarthy,* 179 Conn. 1, 22–23, 425 A.2d 924 (1979); *State* v. *Barlow,* 177 Conn. 391, 393–94, 418 A.2d 46 (1979). On the record before us we cannot say that such an abuse of discretion occurred here.

The trial court had sufficient grounds for deciding that the witness' testimony was admissible. Although she did not identify the defendant from the first photo display and did not recall a bandage on his wrist, the witness' subsequent in-court identification was buttressed by her reliance on the color of the attacker's hair, a significant factor not present in the black and white photographs shown to her, and by her recollection of the name given by her attacker. The trial court had before it two attacks on young girls, one nine and the other twelve, in wooded areas in the same section of Westport, on similar June days one year apart. In each case, the attacker apparently initiated a conversation and offered assistance before seizing his victim. One victim reported that her attacker attempted to choke her with his hands; the other died of traumatic asphyxia, a cause of death which the state's chief medical examiner testified was consistent with manual strangulation. These facts, together with independent testimony concerning the defendant's account of the earlier attack, amply supported the court's determination that the disputed testimony was sufficiently probative of the issue of intent to commit murder to outweigh any prejudicial tendency. There was no error in the admission of the disputed testimony.

## III

The defendant's next claim of error is the trial court's refusal to disqualify two of the state's expert witnesses who were given a transcript of testimony by the defense's expert in violation of a sequestration order, or, in the alternative, the court's refusal to dismiss the case against the defendant because of prosecutorial misconduct in violating that order.[6]

The defendant, who offered an insanity defense, called as his expert witnesses Jonathan Pincus, a neurologist, and Dorothy O. Lewis, a psychiatrist. The state's expert witnesses, Robert Miller, a psychiatrist, and Michael S. Johnson, a psychologist, both received a complete transcript of Pincus' testimony prior to their appearances in court; the assistant state's attorney acknowledged that he had arranged for delivery of that transcript to his witnesses.

At the time Pincus testified a sequestration order affecting all witnesses was in effect. The defendant claims that that order, issued by the court mid-way through the trial in response to a request by counsel for both sides, adopted by reference the terms of the elaborate sequestration order imposed by the court during the hearing on the defendant's motion to suppress his confession. Further, the defendant argues that, even if the more elaborate order is not applicable, the state has

---

[6] The defendant also challenges the trial court's refusal to permit him to call as a witness either the assistant state's attorney who arranged for the transcript or the inspector from the state's attorney's office who delivered it. Since we find the existing record adequate for our decision on this issue, we do not address this claim.

violated the terms of a basic sequestration order in a manner prejudicial to the defendant and hence its expert witnesses should be disqualified.

After a hearing in the absence of the jury, the trial court rejected the defendant's arguments, finding instead that the sequestration order in effect was a limited one and that the state's attorney, although overzealous, did not violate that order, intentionally or otherwise, and was not guilty of prosecutorial misconduct. Although the court found the remedies of disqualification and dismissal too drastic for what it termed an "unwise" action, it took several remedial steps. First, the court ordered that the transcript of Pincus' testimony be withheld from the state's neurologist. Second, the court permitted defense counsel to cross-examine the state's witnesses as to whether they had seen or been influenced by the transcript. Finally, the court informed the jury that in weighing the testimony of the expert witnesses it should remember that Lewis did not have access to Pincus' testimony but that Miller and Johnson did.

In assessing the defendant's claim, it is not necessary for us to determine the scope of the sequestration order in effect at the time of the alleged violation. The state's conduct in providing witnesses barred from the courtroom during Pincus' testimony with a verbatim transcript of that testimony was a clear violation of any sequestration order, narrow or broad, and the trial court erred in finding otherwise. This court has asserted that " '[t]he obvious purpose of sequestering a witness while another is giving his testimony is to prevent the one sequestered from shaping his testimony to cor-

roborate falsely the testimony of the other.' " *State v. Williams,* 169 Conn. 322, 331, 363 A.2d 72 (1975); see *State v. Pikul,* 150 Conn. 195, 200, 187 A.2d 442 (1962). It is sophistical to argue that what can be achieved by hearing spoken testimony inside the courtroom cannot equally be achieved by reading the identical testimony outside the courtroom. This is especially true when the testimony in question, because of its highly technical nature, is less susceptible to influence by the witness' persona than a narrative of events, for example, might be. It is no affront to expert witnesses to suggest that they too may be affected in subtle, inadvertent ways by exposure to the differing views of a colleague. See *State v. Gonzales,* 186 Conn. 426, 435, 441 A.2d 852 (1982). The state's position that physical removal of its witnesses absolves it of wrongdoing would vitiate any sequestration order by exalting form above substance.

The remedy for such a violation rests in the trial court's discretion, guided by a primary concern for "the fairness of the trial, not the culpability of the prosecution." *Smith v. Phillips,* 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); *State v. Cosgrove,* 186 Conn. 476, 488–89, 442 A.2d 1320 (1982). Although in the present case the trial court's remedial measures neutralized any prejudice to the defendant and rendered the error harmless, the state should not in a new trial be encouraged to rely on such subsequent correctives to cure its violation. Should the trial court again impose a sequestration order which "merely prohibits a sequestered witness from being in the courtroom when he is not testifying"; *State v. Williams,* supra, 331; General Statutes § 54-85a; that order cannot be

avoided by the disingenuous strategy of transferring the testifying witness' voice from the courtroom to a transcript.[7]

## IV

The defendant finally challenges the trial court's refusal to honor his request to instruct the jury that manslaughter in the second degree and criminally negligent homicide were lesser included offenses.[8] Instead, the court instructed only on murder and manslaughter in the first degree. We agree that the trial court erred in refusing the additional instruction.

Under General Statutes § 53a-45, the "jury before which any person indicted for murder is tried may find him guilty of homicide in a lesser degree than that charged." Whether an accused may avail himself of this statutory privilege by means of a jury instruction is governed by the principles set forth in *State* v. *Rodriguez,* 180 Conn. 382, 399–400, 429 A.2d 919 (1980), and *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980), and summarized in *State* v. *Maselli,* 182 Conn. 66, 72, 437 A.2d 836 (1980), cert. denied, 449 U.S. 1083, 101 S. Ct. 868, 66 L. Ed 2d 807 (1981): "In view of General Statutes § 53a-45 (c), which allows a defendant indicted for murder to be found guilty of homicide in a lesser degree than that charged, it is clear that any lesser

---

[7] We realize that the trial testimony of all expert witnesses is now a matter of public record. In the event of a retrial and the appearance of the same witnesses, a sequestration order would of course offer no protection to either party. Should new expert witnesses be called, however, any sequestration order imposed by the trial court would be governed by the principle set forth above.

[8] Since the defendant's other claims of error in the trial court's jury instructions are not likely to arise in a retrial, we do not address them today.

degree of homicide may be considered by the trier, subject to the requirements of *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980), that the evidence does support a conviction of the lesser included offense and that the elements differentiating the lesser offense are sufficiently in dispute to justify finding the defendant innocent of the greater offense but guilty of the lesser. *State* v. *Rodriguez,* supra." The issue before us, then, is whether the evidence at trial, including the defendant's confession, can support a conviction for manslaughter in the second degree; General Statutes § 53a-56 (a) (1); or criminally negligent homicide. General Statutes § 53a-58.[9]

The crucial element distinguishing manslaughter in the second degree and criminally negligent homicide from murder and manslaughter in the first degree is intent, "often the most significant and, at the same time, the most elusive element of the crime charged." *State* v. *Rodriguez,* supra, 404. If, based on the admissible evidence presented at trial, the jury could reasonably have found that the defendant acted either recklessly or with criminal negligence in causing the victim's death, then the defendant was entitled to the charge requested.

At trial the state's chief medical examiner testified that, based on the dirt in the victim's mouth and

---

[9] "[General Statutes] Sec. 53a-56. MANSLAUGHTER IN THE SECOND DEGREE: CLASS C FELONY. (a) A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person . . . ."

"[General Statutes] Sec. 53a-58. CRIMINALLY NEGLIGENT HOMICIDE: CLASS A MISDEMEANOR. (a) A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person, except where the defendant caused such death by a motor vehicle."

right lower lobe bronchus, she was probably "alive at the time that her face was in the dirt." In his confession the defendant indicated that when the victim began to bleed "I got scared and I just picked her up and threw her over by that little stream." Combined with the account of the aborted attack a year earlier, when the defendant allegedly removed his hands from the victim's neck and threw her to the ground, this evidence suggests at least a possibility that the defendant acted recklessly or with criminal negligence in leaving a child with her face in the dirt following another such attack.[10] Since we cannot as a matter of law exclude this possibility, the trial court erred in refusing to instruct the jury as requested on the lesser included offenses of manslaughter in the second degree and criminally negligent homicide.

There is error in part, the judgment is set aside and a new trial is ordered.

In this opinion SPEZIALE, C. J., and ARMENTANO, J., concurred.

---

[10] The statutory definitions of these states of mind appear in General Statutes §§ 53a-3 (13) and (14): "(13) A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation;

(14) A person acts with 'criminal negligence' with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation . . . ."

SHEA, J. (concurring). My only disagreement with the majority opinion concerns the portion which purports not to decide whether the police had a duty to inform a suspect of the true object of their intended interrogation but, nevertheless, contains some broad generalizations which point to the existence of such a duty. The statement that "[a]dequate disclosure is one element of the requirement that a confession" be voluntary seems to engraft another per se addition upon the *Miranda* formalization, deviation from which would bar admission of a confession otherwise meeting the totality of the circumstances test for voluntariness which we have heretofore followed. *State* v. *Derrico,* 181 Conn. 151, 163, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980); see *Rogers* v. *Richmond,* 365 U.S. 534, 544, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961). I do not question the relevance of disclosure as one of the circumstances to be weighed, but would not elevate it to the status of a sine qua non. At this time in our history we do not need another per se rule raising an additional barrier to the admission of highly pertinent evidence.

In this opinion HEALEY, J., concurred.