The PEOPLE of the State of Colorado,
Plaintiff–Appellant

v.

Rodger NULL, Defendant–Appellee.

No. 09SA330.

Supreme Court of Colorado.
En Banc.

June 21, 2010.

Robert E. Watson, District Attorney, Thirteenth Judicial District, Nancy Jerman, Deputy District Attorney, Sterling, Colorado, Attorneys for Plaintiff–Appellant.

Douglas K. Wilson, Public Defender, Lauren Crisera, Deputy State Public Defender, Sterling, Colorado, Attorneys for Defendant–Appellee.

Justice BENDER delivered the Opinion of the Court.

In this interlocutory appeal by the prosecution, we review the trial court's decision to suppress defendant Rodger Null's incriminating statements, to suppress his refusal to take a breath test, and to dismiss the driving-under-the-influence ("DUI") charge against him. The suppression of Null's statements presents an appropriate basis for interlocutory appeal, but the suppression of his refusal to take a breath test and the dismissal of the DUI charge do not. To avoid piecemeal litigation and potential double-jeopardy concerns, we exercise our discretion to review the entire appeal under Rule 21 of the Colorado Appellate Rules, and we affirm.

In this case, Null was detained on the side of the road while Washington County police officers investigated him for drunk driving. Null was not free to leave during this time, and he failed a series of roadside sobriety tests, including a preliminary breath test. Following this relatively lengthy detention, two officers surrounded Null, whose back was against a patrol car, and interrogated him without first advising him of his *Miranda* rights. Null gave several incriminating responses. Applying our precedent in *People v. Taylor*, 41 P.3d 681 (Colo.2002), and *People v. Thomas*, 839 P.2d 1174 (Colo. 1992), we agree with the trial court's determination that Null was in custody during questioning. Hence, we affirm that court's order to suppress his incriminating statements.

We also affirm the trial court's determination that Null's rights were violated under Colorado's express consent statute, section 42–4–1301.1, C.R.S. (2009). After interrogating Null, the officers informed him that, pursuant to the express consent statute, he was obligated to take either a blood test or a breath test to determine his blood alcohol content. Null chose a blood test, but the ambulance service, without explanation, refused to come to the jail to perform the test. The arresting officer then told Null that he either had to take a breath test or refuse testing altogether. Null refused testing.

■ The express consent statute not only obligates a driver to take a blood or breath test but also obligates law enforcement to provide a driver with the test that he or she chooses absent extraordinary circumstances. The trial court found that no extraordinary circumstances justified law enforcement's failure to provide Null with a blood test. As a remedy for this violation, the court suppressed Null's refusal to take the breath test and dismissed the DUI charge. We agree with the trial court's findings of fact and conclusions of law. According to the language of the express consent statute and our precedent, the prosecution has the burden to show that extraordinary or non-routine circumstances prevented medical personnel from responding to law enforcement's requests for a blood draw. The prosecution in this case presented no evidence to explain why medical personnel refused law enforcement's request. It therefore failed to carry its burden. Thus, we affirm the trial court's decision to suppress the evidence of Null's refusal to take a breath test. We also conclude that the trial court did not abuse its discretion by dismissing the DUI charge. We remand this case to the trial court for proceedings consistent with this opinion.

## I. Facts and Proceedings Below

In April 2009, Deputy Henderson of the Washington County Sheriff's Office responded to a call concerning a stranded motorist on County Road 30. When Deputy Henderson arrived at the scene, he saw Null sitting in a van parked on the side of the road. Null flashed his headlights at Henderson, and Henderson pulled over and approached the vehicle. Null's eyes looked bloodshot, and his speech appeared slurred. Henderson asked Null for his license and registration, and Null provided a Colorado Identification Card. Henderson contacted dispatch and discovered that Null's license had been revoked. Deputy Henderson asked Null if he had been drinking, and Null responded that he had consumed a few beers earlier. Henderson then asked Null to perform several roadside sobriety tests, such as walking heel-to-toe in a straight line and counting while standing on one leg. Null failed these tests.

Henderson then told Null to lean against his patrol car while he called another officer, Deputy Palmer, to come to the scene to administer a preliminary breath test. While Henderson called Palmer, Null began to walk away from the patrol car into an adjacent field. Henderson followed Null into the field and told him to turn around and stop. Null lay down in the field. Henderson then told Null to get up and return to the patrol car. Null complied.

Approximately fifteen minutes after Henderson first encountered Null, Palmer arrived to administer a preliminary breath test. The results showed that Null had a breath alcohol level of 0.19, well in excess of the legal limit.[1] The trial court found that Null had his back to the patrol car at this point, and the two officers stood approximately four or five feet away, one to Null's left and the other to his right. The officers' weapons were not drawn. But, Henderson testified that if Null had tried to walk away again, he would have "chased" him.

The two officers then began to question Null about how much alcohol he had consumed, where he was coming from, and how he had arrived at his present location. The officers testified that they knew these questions were likely to lead to incriminating responses. Null answered the officers' ques-

---

1. Pursuant to section 42–4–1301(2)(a), C.R.S. (2009), it is a misdemeanor for "any person to drive a motor vehicle or vehicle when the per-

sons [blood or breath alcohol content] is 0.08 or more at the time of driving or within two hours of driving."

tions. He initially stated that a friend had been driving the van and had gone looking for help. He later admitted that he had driven the van.

After questioning Null, Deputy Palmer advised him of his right to choose either a breath or blood test under Colorado's express consent statute, section 42–4–1301.1(2)(a)(I). Null requested a blood test. The officers then advised Null of his *Miranda* rights and placed him under arrest for driving under the influence of alcohol.

Henderson placed Null in his patrol car and took him to the Washington County jail. The Washington County Sheriff's Office contracts with the ambulance service for Washington County to do blood tests for alcohol under the express consent statute. On the way to the county jail, Henderson called police dispatch and asked them to contact the ambulance service for a blood test. Dispatch called the ambulance service but received no response. Upon arriving at the jail, Henderson contacted dispatch again, and dispatch called the ambulance service a second time. Several minutes later, dispatch notified Henderson that the ambulance service had refused to respond. Dispatch did not tell Henderson why the ambulance service refused to respond, and the prosecution has offered no evidence explaining this refusal. Henderson informed Null that no one was available to do a blood test and that Null would have to take a breath test instead or refuse testing. Null refused testing.

The prosecution charged Null with a felony for aggravated driving after revocation, in violation of section 42–2–206(1)(b), C.R.S. (2009); with a misdemeanor for driving under the influence, in violation of section 42–4–1301(1)(a), C.R.S. (2009); and with other offenses for driving under restraint, failing to have insurance, and failing to have a registration card with the vehicle.

After a pretrial evidentiary hearing, the court granted Null's motion to suppress his incriminating statements. The court ruled that, after Henderson brought Null back to the patrol car and the officers physically surrounded him, "a reasonable person in [Null's] position would have believed that his liberty was constrained to an extent associat-ed with a formal arrest." The court explained that, at this point in the encounter, "the situation had morphed from an initial citizen-police encounter[,] to an investigatory detention, into a formal arrest." The court concluded that Null was in custody for *Miranda* purposes and suppressed the incriminating statements that he made in response to the officers' questioning.

The court also granted Null's motion to dismiss the DUI charge and to suppress the evidence of his refusal to submit to the breath test. The court stated that the failure to provide Null with his requested blood test violated Null's statutory rights under Colorado's express consent statute. The court reasoned that suppression of Null's refusal to take the breath test and dismissal of the alcohol-related charge were proper remedies unless the prosecution presented evidence that exceptional circumstances justified the failure to provide the requested test. The court found that the record did not disclose why the medical personnel refused to administer the blood test. The court concluded that "there [was] no showing of extraordinary circumstances justifying the failure of the medical personnel responding to administer the test." Therefore, the court ordered the suppression of the evidence of Null's refusal to submit to a breath test and dismissed the DUI charge.

## II. Jurisdiction

The prosecution brought this case as an interlocutory appeal pursuant to section 16–12–102, C.R.S. (2009), and C.A.R. 4.1. Under C.A.R. 4.1, the prosecution may file an interlocutory appeal from a ruling of the trial court suppressing three types of evidence: (1) evidence obtained pursuant to an unlawful search and seizure, Crim. P. 41(e); (2) an involuntary confession or admission, Crim. P. 41(g); or (3) an improperly ordered or supported nontestimonial identification, Crim. P. 41.1(i). *See People v. Braunthal*, 31 P.3d 167, 171 (Colo.2001). The statute and the rule provide "extremely narrow" grounds for an interlocutory appeal by the prosecution. *Id.* We have dismissed cases that did not follow these procedures or seek relief under the specific circumstances outlined in C.A.R.

4.1. *See, e.g., People v. McNulty*, 173 Colo. 491, 493, 480 P.2d 560, 561 (1971).

■■■ Where the grounds for an interlocutory appeal are absent, however, the Colorado Constitution and C.A.R. 21 provide this court with jurisdiction to review cases on the merits as original proceedings. Colo. Cons. art. VI, § 3; C.A.R. 21; *Braunthal*, 31 P.3d at 167. The exercise of original jurisdiction is discretionary. *Jones v. District Court*, 780 P.2d 526, 528 (Colo.1989). We have exercised such jurisdiction when a pretrial ruling "significantly interfered with a party's ability to litigate" the case, *People v. District Court*, 793 P.2d 163, 166 (Colo.1990) (exercising original jurisdiction to review trial court's order preventing prosecution from calling crucial informant as witness), and to review an abuse of discretion when an appellate remedy would not otherwise suffice, *People v. District Court*, 790 P.2d 332, 334–35 (Colo. 1990) (exercising original jurisdiction to review trial court's order disqualifying the entire District Attorney's Office for the judicial district).

■■■ In the present case, the trial court's order to suppress Null's statements due to a *Miranda* violation involves an involuntary confession or admission under Crim. P. 41(g). Therefore, it presents a proper subject for interlocutory appeal under C.A.R. 4.1. However, the suppression of Null's refusal to take a breath test and the order to dismiss the DUI charge do not meet the requirements of C.A.R. 4.1 and the remedy would normally be an appeal to the court of appeals. *See* § 16–12–102(1), C.R.S. (2009) (order of court dismissing some, but not all, charges prior to trial is appealable to court of appeals); *People v. Collins*, 32 P.3d 636, 639 (Colo.App. 2001) (under section 16–12–102(1), court of appeals may review any order dismissing one or more charges prior to trial). Hence, we consider whether it is appropriate to exercise original jurisdiction over these issues.

Suppression of Null's refusal to take a breath test could significantly impede the prosecution's case. Likewise, an appellate remedy could raise double jeopardy issues. For example, if the trial were to proceed with wrongly suppressed evidence, and if Null were to be acquitted, then he could not be retried. *See People v. Casias*, 59 P.3d 853, 856 (Colo.2002) (exercising original jurisdiction in light of similar double jeopardy concerns); *People v. District Court*, 793 P.2d 163, 166 (Colo.1990) (same). Finally, it would waste public and judicial resources to consider these appeals piecemeal. Therefore, we conclude that it is proper to exercise original jurisdiction over the merits of the prosecution's appeal.

### III. *Miranda* Violation

Initially, we review the trial court's determination that Null's *Miranda* rights were violated because he was in custody when he made incriminating statements to the arresting officers. The prosecution concedes that Null was subject to interrogation.[2] Thus, we focus on whether he was "in custody" for *Miranda* purposes.

■■■ The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In order to protect this right, police must provide a suspect in custody with certain warnings before subjecting him or her to interrogation. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Statements obtained without such warnings are subject to suppression. *People v. Lee*, 630 P.2d 583, 590 (Colo.1981).

■■■ When a trial court rules on a motion to suppress incriminating statements, the court engages in both fact-finding and law-application. *People v. Hankins*, 201 P.3d 1215, 1218 (Colo.2009). A determination of whether a person was in custody during interrogation presents a mixed question of law

---

**2.** At the pretrial evidentiary hearing, the officers testified that they asked Null questions that they knew were likely to lead to incriminating responses. Therefore, Null was subject to interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (establishing that interrogation occurs whenever law enforcement officers use "words or actions which they should know are reasonably likely to elicit an incriminating response from the suspect"). The prosecution appears to concede this issue in its appeal.

and fact, which we review de novo. *People v. Matheny*, 46 P.3d 453, 462 (Colo.2002).

▪ Roadside detentions pursuant to routine traffic stops often do not implicate *Miranda* protections. *People v. Archuleta*, 719 P.2d 1091, 1093 (Colo.1986) ("[T]he roadside questioning of a motorist detained pursuant to a routine traffic stop does not necessarily constitute 'custodial interrogation' for the purpose of the rule established in *Miranda*."). A routine traffic stop is "presumptively temporary and brief," lasting "only a few minutes." *Berkemer v. McCarty*, 468 U.S. 420, 437, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (holding that ordinary traffic stops do not implicate *Miranda* protections). And it generally lacks the "police dominated" and coercive atmosphere that defines a custodial situation. *Id.* at 438–39, 104 S.Ct. 3138; *see also People v. Reddersen*, 992 P.2d 1176, 1180 (Colo.2000) (holding that defendant was not in custody when he consented to a search because the officer was merely conducting a routine traffic stop).

▪ This is not to say, however, that routine traffic stops may not become custodial. "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Berkemer*, 468 U.S. at 440, 104 S.Ct. 3138.

▪ To determine whether a suspect was in custody, we ask whether a reasonable person in the suspect's position would have felt "deprived of his freedom of action to the degree associated with a formal arrest." *People v. Taylor*, 41 P.3d 681, 691 (Colo.2002) (internal quotation marks omitted). This is an objective inquiry made on a case-by-case basis in light of the totality of the circumstances. *People v. Horn*, 790 P.2d 816, 818 (Colo.1990).

Although there is no exclusive list of factors, we have considered the following circumstances to determine whether a suspect was in custody during interrogation: (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Hankins*, 201 P.3d at 1218–19 (applying these factors to conclude that defendant was not in custody when he made incriminating statements regarding a suspected murder and directed police to the burial site of the victim); *see also People v. Thiret*, 685 P.2d 193, 203 (Colo.1984) (holding that courts must make custody determinations based on totality of the circumstances and establishing non-exclusive list of factors that courts may consider).

In *People v. Thomas*, 839 P.2d 1174, 1176–78 (Colo.1992), we applied these factors to determine that a routine traffic stop had become a custodial situation entitling the defendant to *Miranda* protections. In that case, the officer stopped the defendant for driving with an altered temporary registration sticker. *Id.* at 1176. The officer issued a warning to the defendant and told him he was free to go. *Id.* The officer noticed, however, that the defendant appeared nervous, so he asked the defendant if he would respond to a few questions and would consent to being searched. *Id.* The defendant consented. *Id.* The officer then patted the defendant down and found a marijuana pipe in his pocket. *Id.* The officer told the defendant that he was being detained and that, at the very least, he would be given a ticket for possession of the pipe. *Id.* The officer also called for back-up to watch the defendant while a search of the car could be conducted. *Id.* The officer then interrogated the defendant, and the defendant eventually revealed that he had cocaine and marijuana in his vehicle. *Id.* At this point, the officer read the defendant his *Miranda* rights. *Id.*

We concluded that the encounter remained noncustodial until the officer searched the defendant. *Id.* at 1178. Before the search took place, the defendant was free to go, and he consented to being questioned and searched. The situation changed, however, after the officer found the marijuana pipe in the defendant's pocket. We concluded that "[o]nce the pot pipe was found ... the defendant was in custody." *Id.* We arrived at this conclusion by relying on the fact that discovery of the pipe gave the officer grounds to detain the defendant; that the officer had called for back-up in order to search the defendant's vehicle; and that the officer testified that the defendant was no longer free to go after the search. *Id.*

We came to a similar conclusion in *People v. Taylor*, 41 P.3d 681, 683–85 (Colo.2002). In that case, police stopped a vehicle in order to execute an arrest warrant for the driver. *Id.* at 683. The defendant was a passenger in the vehicle. *Id.* at 684. After one of the officers arrested the driver, another officer asked the defendant to exit the vehicle because they were going to search the vehicle incident to the driver's arrest. *Id.* This officer frisked the defendant and found four knives. *Id.* The officer then brought the defendant to the back of the vehicle and stood close to him, so that he was essentially "surrounded by the [vehicle] and each of the officers." *Id.* During the search of the vehicle, the officers found a black box containing drug paraphernalia and a white powdery substance. *Id.* All told, the officers detained the defendant for approximately nineteen minutes. *Id.* at 692.

We concluded that the defendant was in custody for *Miranda* purposes. *Id.* at 693. We relied particularly on several factors. First, the defendant was limited in his movements. *Id.* Second, he was detained for a "relatively lengthy" period. *Id.* And, third, the officers had grounds to arrest the defendant, giving him " 'every reason to believe he would not be briefly detained and then released.' " *Id.* at 692–93 (quoting *People v. Polander*, 41 P.3d 698, 705 (Colo.2001)).

▮ The present case is similar to both *Taylor* and *Thomas.* As in those cases, what began as a "routine" encounter between po-lice and the defendant quickly became a custodial situation. First, Null was not free to go during questioning. When he attempted to walk away, Henderson followed him and told him to return to the patrol car. Henderson testified that if Null had walked away from the van again, he would have "chased" him. Second, Null's freedom of movement was significantly limited during questioning. Although he was not hand-cuffed and the officers had not drawn their weapons, the officers stood only a few feet from Null. One officer stood to his left and the other stood to his right, while Null had his back against the patrol car. Like the defendant in *Taylor*, Null appears to have been "surrounded" by the patrol car and the officers on either side of him. Third, Null was held on the side of the road for at least fifteen minutes (while Henderson waited for Palmer to arrive) plus the amount of time it took for Henderson to conduct several road-side sobriety tests and call dispatch to check Null's license. This was a relatively lengthy detention. Finally, Null failed two sobriety tests and the preliminary breath test before the interrogation began. As such, the officers had grounds to arrest Null. These circumstances, when combined, establish that Null had objective reasons to believe that he was under arrest and would not be briefly detained and then released.

Considering the totality of the circumstances, we conclude that Null was in custody during questioning. This was not the brief, noncoercive, and routine traffic stop contemplated by the courts in *Berkemer*, 468 U.S. 420, 104 S.Ct. 3138, and *Archuleta*, 719 P.2d 1091. Rather, it was a relatively lengthy detention during which Null was surrounded, unable to leave, and facing probable arrest. It was a coercive and police-dominated atmosphere. A reasonable person in similar circumstances would have felt deprived of his freedom of action to the degree associated with a formal arrest. Therefore, we hold that Null was in custody for *Miranda* purposes during interrogation, and we affirm the trial court's order to suppress his incriminating statements.

## IV. Colorado Express Consent Law

Next we review the trial court's determination that law enforcement violated Null's statutory rights under the express consent statute and consider whether this violation warranted suppression of Null's refusal to take a breath test and dismissal of the DUI charge. A driver, by virtue of operating a motor vehicle upon the streets or highways of Colorado, consents to the provisions of the express consent statute. § 42–4–1301.1, C.R.S. (2009). Under this statute, a police officer with probable cause to believe that a driver has committed an alcohol-related offense may require the driver to select and to complete either a blood test or a breath test. *Id.* Once a driver has selected a particular test, the driver must submit to that test within two hours or refuse testing altogether. *Id.* Drivers who refuse to be tested may have their licenses revoked for a year. § 42–4–1301.2(1).

The express consent statute creates mutual "rights and responsibilities" that apply to both drivers and law enforcement officers. *Turbyne v. People*, 151 P.3d 563, 568 (Colo.2007). By requiring drivers to submit to testing, the statute enables law enforcement to gather evidence that may aid in the prosecution of drinking-and-driving offenses. *Id.* (citing *Zahtila v. Motor Vehicle Div., Dep't of Revenue*, 39 Colo.App. 8, 560 P.2d 847, 849 (1977)). But testing can also establish a driver's innocence. *People v. Gillett*, 629 P.2d 613, 619 (Colo.1981) ("[T]esting can establish innocence as well as guilt"). The statute thus provides a driver with the right to receive the test that he or she chooses. § 42–4–1301.1(2)(a.5)(I–IV). Law enforcement is obligated to provide that test. *Id.*

The statute, however, contains an "extraordinary circumstances" exception to the rule that law enforcement must provide a driver with his or her chosen test. § 42–4–1301.1(2)(a.5)(I). The legislature added this exception to the statute in 2007, directly incorporating language from our decisions in *Riley v. People*, 104 P.3d 218, 222 (Colo. 2004), and *Turbyne*, 151 P.3d at 570–71. The express consent statute now provides that, once a driver has chosen a particular test, he

or she has a right to receive that test unless "the officer determines there are extraordinary circumstances that prevent the completion of the test elected by the person within the two-hour time period." § 42–4–1301.1(2)(a.5)(I).

Subsection (A) provides a general definition of extraordinary circumstances. It states that "extraordinary circumstances means circumstances beyond the control of, and not created by, the law enforcement officer who requests and directs a person to take a blood or breath test ... or the law enforcement authority with whom the officer is employed." § 42–4–1301.1(2)(a.5)(IV)(A). Subsection (B) then offers examples of extraordinary circumstances. It states that such circumstances shall include "weather-related delays, high call volumes affecting medical personnel, power outages, malfunctioning breath test equipment, and other circumstances that preclude timely collection and testing." § 42–4–1301.1(2)(a.5)(IV)(B). Finally, subsection (C) lists circumstances that shall not be considered extraordinary. It states that extraordinary circumstances shall not include "[i]nconvenience, a busy workload on the part of the law enforcement officer or law enforcement authority, minor delay that does not compromise the two-hour test period ... or routine circumstances that are subject to the control of the law enforcement officer or law enforcement authority." § 42–4–1301.1(2)(a.5)(IV)(C).

Relying on subsection (A), the prosecution argues that the extraordinary circumstances exception applies in this case because medical personnel refused to perform the requested blood test and that this refusal was a circumstance outside law enforcement's control. The prosecution asserts that it is irrelevant why or how routinely medical personnel failed to respond to law enforcement's requests.

We decline to adopt the prosecution's interpretation of the statute. Instead, we hold that, where medical personnel do not respond to law enforcement's request for a blood test, the statute requires the prosecution to present evidence to explain why they were unable to respond. More precise-

ly, the prosecution must show that extraordinary or "non-routine" circumstances prevented medical personnel from responding to law enforcement's requests. We adopt this interpretation because it represents a more harmonious and contextualized reading of the statute; it aligns with our prior case law concerning the extraordinary circumstances exception; and it serves the overall purpose of the statute by incentivizing law enforcement to alter its protocols for providing blood tests if those protocols fail under routine circumstances.

## A. Statutory Construction

We review issues of statutory construction de novo. *CLPF–Parkridge One, L.P. v. Harwell Invs., Inc.,* 105 P.3d 658, 661 (Colo.2005). Our primary purpose is to effectuate the legislature's intent. *People v. Cross,* 127 P.3d 71, 73 (Colo.2006). Therefore, we first consider the plain language of the statute. *Id.* If the language is ambiguous, we employ several canons of statutory interpretation. *Id.* We attempt to harmonize potentially conflicting provisions. *Id.* We also avoid interpretations that would render any words or phrases superfluous or would lead to illogical or absurd results. *Id.*

Turning to the first test, we conclude that the statutory language is ambiguous. Subsection (A) provides that the term "extraordinary circumstances" means circumstances outside the control of the law enforcement officer or authority. · § 42–4–1301.1(2)(a.5)(IV)(A). Subsections (B) and (C) list examples of extraordinary circumstances, but these examples complicate rather than clarify the definition provided in subsection (A). *See* § 42–4–1301.1(2)(a.5)(IV)(B)–(C). Subsection (B) lists "weather-related delays" and "high call volumes affecting medical personnel" as examples of circumstances that would justify the failure to provide a driver with his or her chosen test. § 42–4–1301.1(2)(a.5)(IV)(B). These examples do not relate solely to circumstances within law enforcement's control. "[H]igh call volumes affecting medical personnel," by its very terms, relates only to circumstances affecting medical personnel. Similarly, "weather-

related delays" comes from *Turbyne,* 151 P.3d at 571, in which we considered whether bad weather could excuse medical personnel's inability to respond to a requested blood test. If the statute were meant to capture all circumstances outside law enforcement's direct control, such specificity would be unnecessary. The statute would have simply stated that extraordinary circumstances shall include medical personnel's inability to respond to law enforcement's request, irrespective of the reason. By identifying certain acceptable reasons that medical personnel might not respond, however, subsection (B) implies that other reasons might not be acceptable and that evidence of those reasons must be presented.

Subsection (C) confirms this analysis. Subsection (C) indicates that "[i]nconvenience, a busy workload on the part of the law enforcement officer or law enforcement authority, [and] minor delay that does not compromise the two-hour test period" do not constitute extraordinary circumstances. § 42–4–1301.1(2)(a.5)(IV)(C). The example of a busy workload, by its terms, relates to law enforcement. The term "inconvenience," however, does not contain that same limiting language. In other words, the statute suggests that inconvenience in general—whether it is on the part of medical personnel or law enforcement—will not constitute an extraordinary circumstance justifying the failure to honor a driver's rights.

In sum, although subsection (A) might refer to law enforcement only, the examples listed in subsections (B) and (C) indicate that courts must also consider why medical personnel failed to provide a requested test and must determine whether that failure resulted from extraordinary circumstances—such as bad weather or high call volumes—or ordinary ones—such as inconvenience. This conflict between the subsections renders the statute ambiguous. By adopting an interpretation that considers why medical personnel refused to respond, we attempt to harmonize these provisions. More importantly, we avoid rendering superfluous much of the language in subsections (B) and (C).

This interpretation also aligns with our case law in *Riley* and *Turbyne,* in which we

initially developed the extraordinary circumstances exception.[3] In *Riley,* we stated that once a suspect has chosen a particular test, "the onus [is] on the officer to comply— barring extraordinary circumstances." 104 P.3d at 222. We defined extraordinary circumstances as "circumstances beyond the officer's control." *Id.* But we clarified that "inconvenience, a busy work load or delay do not suffice to comprise extraordinary circumstances sufficient to excuse compliance with the statute." *Id.* In that case, the sheriff's office asked the ambulance service to perform a blood test, but the ambulance service was unable to respond within the two-hour period. *Id.* at 219. There was no indication that the ambulance service's refusal to respond was within law enforcement's immediate control. Nevertheless, we declined to apply the extraordinary circumstances exception because the prosecution offered no evidence explaining why the ambulance service was unable to respond. *Id.* at 222.

We reiterated this approach in *Turbyne.* In that case, we chose to apply the extraordinary circumstances exception because the prosecution presented evidence showing that the ambulance service had good reasons— high call volumes combined with bad weather—for failing to perform a requested blood draw. *Turbyne,* 151 P.3d at 571. We distinguished our holding in *Turbyne* from *Riley* by noting that the extraordinary circumstance exception was "inapplicable in [*Riley* ] because the prosecution did not present any evidence of extraordinary circumstances that *prevented* the usual service provider of such blood draws from administering the test within the required two[-]hour period." *Id.* at 570 (emphasis added). Thus, the interpretation we adopt today aligns with our prior case law, which required the prosecution to present evidence that extraordinary circumstances prevented medical personnel from responding to law enforcement's requests.

▮ Our approach also accounts for the requirement in subsection (C) that extraordinary circumstances shall not include "*routine* circumstances that are subject to the control

of the ... law enforcement authority." § 42–4–1301.1(2)(a.5)(IV)(C) (emphasis added). The statute does not define what should be considered "subject to the control of the law enforcement authority." Our case law, however, indicates that it should be interpreted to encompass the protocols that law enforcement establishes for providing drivers with their chosen tests. *See Turbyne,* 151 P.3d at 571 (applying the extraordinary circumstances exception in part because the police department had an "adequate protocol" in place for obtaining blood draws); *Gillett,* 629 P.2d at 619 (suppressing defendant's refusal to take a breath test because the police department failed to take "routine steps in order to implement the arrested driver's right to a blood test"). In other words, pursuant to our case law and the amended statute, law enforcement has control over the protocols that it develops to provide a driver with his or her chosen test. If those protocols fail routinely or under routine circumstances, then that failure cannot be excused as extraordinary. The prosecution has the burden to demonstrate extraordinary circumstances. It therefore must present evidence that non-routine circumstances prevented medical personnel from responding to law enforcement's request.

A contrary interpretation—one that allows the prosecution to present no evidence explaining why medical personnel refused to respond—would allow medical personnel to refuse routinely to respond to law enforcement's requests, without any explanation, yet that occurrence would be considered extraordinary under the statute. Drivers would then have no remedy for such violations, and law enforcement would have no incentive to develop more reliable protocols. Such an interpretation would undermine the legislative purpose of the statute, which is designed, in part, to provide drivers with the right to receive the test of their choice under ordinary circumstances. *See Spahmer v. Gullette,* 113 P.3d 158, 161–62 (Colo.2005) (where the statutory language is unclear, courts must adopt the construction that best

---

**3.** Although the statute has been amended since we issued our opinions in *Riley* and *Turbyne,* because the statute incorporated language directly from those cases, their facts and reasoning remain relevant when interpreting the language of the statute.

serves the purposes of the legislative scheme); *Cross,* 127 P.3d at 74 (courts must "consider the consequences of a particular construction and avoid constructions that produce illogical or absurd results").

Hence, we interpret the statute as requiring the prosecution to present evidence that extraordinary or "non-routine" circumstances prevented medical personnel from responding to law enforcement's request. This approach better effectuates the legislative purpose of the statute, follows our case law, and ensures that law enforcement adopts adequate protocols that are able to provide a driver with his or her chosen test under ordinary circumstances.

### B. Application

■ Having interpreted the statute, we now apply it to the present case. The record indicates that Henderson twice asked for a medical team to come to the jail to perform a blood test but that the medical team refused to respond to these requests. Our prior case law and the amended statute require the prosecution to present evidence that extraordinary circumstances prevented medical personnel from responding to law enforcement's request. The prosecution, however, offered no evidence to explain why medical personnel refused to respond. We do not know whether they may have refused for legitimate reasons, such as high call volumes, or for illegitimate reasons, such as inconvenience. Nor has the prosecution provided any evidence indicating whether such refusals were themselves routine or unusual. In the absence of such evidence, we are unable to conclude that medical personnel's refusal to perform a blood test constituted extraordinary circumstances. The prosecution failed to carry its evidentiary burden. We shall not give it "a second bite at the apple." *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). Therefore, we affirm the trial court's finding that no extraordinary circumstances justified the failure to honor Null's statutory right to receive a blood test.

### C. Suppression of Evidence and Dismissal of the DUI Charge

We next consider whether the trial court acted appropriately by suppressing the evidence of Null's refusal to take a breath test and by dismissing the DUI charge. Although the statute adopted the extraordinary circumstances exception, which is a part of our jurisprudence on remedies, it otherwise remained silent on which remedies a court should employ when no extraordinary circumstances are found. Therefore, we look to our prior case law for guidance.

■ Courts retain discretion to fashion appropriate remedies for violations of the express consent statute. *See Gillett,* 629 P.2d at 619; *Turbyne,* 151 P.3d at 569. We review such determinations for an abuse of discretion. *Turbyne,* 151 P.3d at 569. "Sanctions must be tailored to remedy improper police conduct in the case; dismissal or suppression of evidence may be appropriate in some cases but not in others." *Id.* at 570.

In *People v. Shinaut,* 940 P.2d 380 (Colo. 1997), we found that dismissal and suppression were not warranted where law enforcement simply permitted a driver to change his mind and take a blood test after first requesting a breath test. Although we concluded that the officer erred by allowing the defendant to take an alternate test, we found that dismissal and suppression were inappropriate remedies because the violation occurred as a result of the driver's voluntary choice. *Id.* at 384. In other words, although law enforcement may have violated the statute, it did not deprive the driver of his right to receive his chosen test under that statute.

On the other hand, we have held suppression and dismissal to be appropriate where law enforcement failed to honor a driver's right to receive his or her chosen test. *Gillett,* 629 P.2d at 619; *Riley,* 104 P.3d at 222. Under such circumstances, a sanction is necessary so that the state may not violate a defendant's rights without consequence. As we have explained, dismissal and suppression "vindicate[ ] the proposition that the state may not 'disregard the statutory rights of the drivers with impunity.' " *Turbyne,* 151 P.3d at 569 (quoting *Gillett,* 629 P.2d at 618).

■ In the present case, Null did not change his mind or request an alternate test.

Rather, law enforcement violated his statutory rights by failing to provide him with the test that he chose. The prosecution failed to carry its burden to demonstrate that extraordinary circumstances justified that failure. As our case law indicates, law enforcement may not violate a defendant's statutory rights with impunity. Therefore, we hold that the trial court acted within its discretion when it suppressed the evidence of Null's refusal to take a breath test and dismissed the DUI charge against him.

## V. Conclusion

In light of the above considerations, we affirm the trial court's decision to suppress Null's incriminating statements, to suppress his refusal to take a breath test, and to dismiss the DUI charge against him. We remand this case to that court for proceedings consistent with this opinion.

Justice HOBBS concurs in part and dissents in part.

Justice EID concurs in the result in part and dissents in part.

Justice HOBBS, concurring in part and dissenting in part.

I concur with the majority's affirmation of the trial court's suppression of Rodger Null's incriminating statements. However, I write separately because I conclude that the majority's discussion of Colorado's express consent statute, § 42–4–1301.1, C.R.S. (2009), and our decision in *Turbyne v. People*, 151 P.3d 563 (Colo.2007), is incomplete on the issue of law enforcement diligence in providing a driver with his or her choice of a blood test. In the context of this original proceeding, affirmation of the trial court's suppression of Null's refusal to take a breath test and its dismissal of the DUI charge are premature.

This case presents our first opportunity to construe the 2007 amendment to the express consent statute codifying the extraordinary circumstances exception. Ch. 261, sec. 1, § 42–4–1301.1, 2007 Colo. Sess. Laws 1022, 1023–24. In my view, the statute and our prior decisions require us to consider law enforcement diligence in determining the ap-propriate sanction for police noncompliance with the statute.

Dismissal of the charges against a defendant is a drastic remedy that may be appropriate in some cases but not in others. *Turbyne*, 151 P.3d at 569–70. Our case law requires that dismissal of a DUI charge is an appropriate sanction for police noncompliance with the express consent statute only "when the police have no reasonable protocol in place to obtain and complete the blood test under routine circumstances, *or when the blood test is not administered and there is no showing of a good faith effort by the arresting officer to follow that protocol."* *Id.* at 569 (emphasis added).

Under the express consent statute and our decisions, the established protocol upon which law enforcement relies must be reasonably calculated to obtain a timely blood draw, given reasonably anticipated exigencies, and law enforcement must exercise a degree of diligence in complying with that protocol in any given case. *See* § 42–4–1301.1(2)(a.5)(I); *Turbyne*, 151 P.3d at 569; *Riley v. People*, 104 P.3d 218, 221–22 (Colo. 2004); *People v. Gillett*, 629 P.2d 613, 618 n. 9 (Colo.1981). For example, if the ambulance service with which law enforcement has contracted lacks adequate response capability to cover law enforcement's needs, in addition to the needs of other customers, the protocol fails to comply with the statutory requirement that law enforcement, in the absence of extraordinary circumstances, honor a driver's choice of a blood test. Further, law enforcement's failure to abide by a driver's choice must not result from its failure to make a good faith effort to follow that protocol.

In this case, the fact that law enforcement twice attempted to obtain a response from the ambulance service is not sufficient proof of a good faith effort to follow an established and adequate protocol because the record lacks any proof of law enforcement's diligence in attempting to ascertain the reason for the service's non-response. Absent such proof in the record, suppression of Null's refusal to take a breath test and dismissal of the DUI charge may be appropriate sanc-

tions under *Turbyne*. However, without further findings regarding law enforcement's diligence in determining the reason for the ambulance service's non-response, I find incomplete and premature the majority's analysis affirming suppression of Null's refusal to take a breath test and dismissal of the DUI charge. On remand, the trial court should allow the prosecution to present additional evidence regarding law enforcement's good faith effort to abide by its protocol.

Accordingly, I concur with the majority's affirmation of the suppression of Null's incriminating statements, but I do not join in the judgment affirming suppression of Null's refusal to take a breath test and dismissal of the DUI charge. In my view, the rule in this original proceeding should remand the case to the trial court for further findings. Thus, I respectfully dissent in part.

Justice EID, concurring in the result in part and dissenting in part.

I respectfully dissent from the majority's conclusion that the DUI charges against Null must be dismissed because he did not receive a blood test within the statutory two-hour period. The Washington County Sheriff's Office had a contract with an ambulance service to perform blood draws upon its request, and that service had responded to requests by the sheriff's office in the past; in this case, however, the service refused to respond despite the arresting officer's repeated requests to send medical personnel to the county jail to perform a blood draw on Null. Under *Turbyne v. People*, 151 P.3d 563, 569 (Colo.2007), dismissal of the charges is inappropriate because "the police [had a] reasonable protocol in place to obtain and complete the blood test under routine circumstances" and the officer made a "good faith effort ... to follow that protocol." Additionally, given the overwhelming evidence of Null's intoxication—he could not keep his head still in

order to permit the arresting officer to examine his pupils; he could not walk a few steps without stumbling or raise one leg a few inches without falling; he wandered away from the patrol car and lay down in an adjacent field to "take a nap"; and his preliminary breath test yielded a 0.19—there is little chance that the failure to provide him with a blood test "denie[d him] the right to produce exculpatory evidence." *Riley v. People*, 104 P.3d 218, 221 (Colo.2004) (discussing *People v. Gillett*, 629 P.2d 613 (Colo. 1981)). Under these circumstances, the majority's invocation of the "drastic remedy" of dismissal of the DUI charges is misplaced. *Turbyne*, 151 P.3d at 569.[1]

### I.

As Justice Hobbs points out in his dissent, the "drastic remedy" of dismissal is appropriate only "when the police have no reasonable protocol in place to obtain and complete the blood test under routine circumstances or when the blood test is not administered and there is no showing of a good faith effort by the arresting officer to follow that protocol." Conc. & dis. op. at 682 (citing *Turbyne*, 151 P.3d at 569) (emphasis omitted). Unlike Justice Hobbs, however, I would not remand the case for further development of the record regarding whether the arresting officer's conduct in this case amounted to a "good faith effort," conc. & dis. op. at 683, but instead would find the *Turbyne* test to be satisfied on the record before us.

First, under *Turbyne*, the Washington County Sheriff's Office "ha[d a] reasonable protocol in place to obtain and complete the blood test under routine circumstances." 151 P.3d at 569. As the arresting officer testified below, the sheriff's office had contracted with an ambulance service to perform blood draws upon its request. The officer testified that the "normal procedure" is to request that the

---

**1.** I concur in the judgment with regard to the majority's conclusion that suppression of Null's statements was appropriate. Maj. op. at 677. By the time Null was questioned, he had failed two roadside sobriety tests, as well as a preliminary breath test, and was unable to hold his head still enough so that an examination of his pupils could be conducted. At that point, it was "apparent to all" that Null would not be released

after the investigation concluded, but rather would be arrested. *People v. Polander*, 41 P.3d 698, 705 (Colo.2001); *see also People v. Taylor*, 41 P.3d 681, 693 (Colo.2002) (same). *Compare People v. Stephenson*, 159 P.3d 617, 623 (Colo. 2007) (concluding that it was not apparent that the defendant would be arrested where he did not own the vehicle in which drugs were found).

ambulance service dispatch medical personnel to the county jail to perform a blood draw. According to the officer, the ambulance service had performed such blood draws "several times" to his knowledge. In other words, the protocol the sheriff's office had in place worked "under routine circumstances" and was thus "reasonable."

Second, the arresting officer made a "good faith effort ... to follow that protocol" in contacting sheriff's dispatch to request that the ambulance service provide medical personnel to the county jail to perform a blood test on Null. The officer testified that he followed "normal procedure" in requesting the ambulance and that he did nothing that was "off the procedure." When the ambulance service did not respond to his first request, he made a second one. Again, there was no response to his request. The officer testified that he had no authority to order medical personnel to the jail. He also testified that because of the rural location of the Washington County Justice Center, there are few alternatives for blood draw services. According to the officer, the closest hospitals where blood could be drawn were a thirty-or forty-minute drive away (which would put the draw outside the two-hour period), and the closest jail that could complete the blood test was in another jurisdiction. Under the circumstances, the arresting officer made a "good faith effort ... to follow" the "protocol" established by the Washington County Sheriff's Office for performing blood draws.

The majority relies on our statement in *Turbyne* that a driver's statutory rights cannot be disregarded "with impunity." Maj. op. at 681 (citing *Turbyne*, 151 P.3d at 569). However, the majority does not go on to describe the circumstances identified in *Turbyne* that constitute "impunity"—that is, as noted above, where there is no protocol in place or where the law enforcement officer has not made a good faith effort to comply with the protocol. Because both factors were satisfied in this case, the majority's dismissal is misguided.

A closer examination of the cases leading up to *Turbyne* confirms the majority's error. As we recognized in *Gillett*, 629 P.2d at 619, the remedy of dismissal is aimed at "pre-vent[ing] manifest unfairness in governmental procedures relating to the acquisition ... of evidence potentially favorable to an accused." More specifically, respecting the driver's choice of a blood test is important given that "the blood itself can provide the driver with a precise record of the alcoholic content of his blood should he elect to demonstrate that he was below the statutory presumption of impairment or intoxication." *Id.* at 618. Thus, we have stated that "when the officer denies the driver his test of choice, he deprives the driver of his right to establish non-intoxication—or stated otherwise, he denies the driver the right to produce exculpatory evidence." *Riley*, 104 P.3d at 221 (discussing *Gillett*, 629 P.2d 613).

In this case, however, there is little chance that the failure to administer a blood test within the two-hour period deprived Null of exculpatory evidence because there was overwhelming evidence of his intoxication. In such a case, dismissal is inappropriate, as there would be no "manifest unfairness in governmental procedures relating to the acquisition ... of evidence potentially favorable to an accused." *Gillett*, 629 P.2d at 619.

In this case, Null exhibited all the signs of intoxication. According to the officer, when he first spoke to Null, he noticed that Null's eyes were bloodshot and watery, his speech was slurred, and there was a strong odor of alcohol on his breath. After observing Null's condition, the officer subjected him to three tests for intoxication. First, he asked Null to keep his head still so that he could determine whether his pupils were involuntarily jerking. The officer, however, could not perform the test because Null was unable to keep his head still. When the officer moved on to another test for intoxication, which required Null to walk heel-to-toe nine steps and then turn around, Null could only take two or three steps before stumbling. The officer, concerned that Null would fall and injure himself, ultimately stopped him after his second attempt. Finally, the officer asked Null to perform a third test involving him raising one leg six inches off the ground and counting out loud until the officer told him to stop. Null only counted five or six numbers before

stumbling and, again, the officer stopped the test for Null's safety.

The officer then asked Null to lean against his patrol vehicle while he contacted another officer who had the preliminary breathalyzer testing unit. By the time that the officer was finished radioing for backup, he noticed that Null was walking slowly through an adjacent field. The officer then followed Null and asked him what he was doing. At this point, Null lay down in the middle of the field and responded that he just wanted to "take a nap" because he was tired. When the second officer arrived and the preliminary breathalyzer test was administered, Null registered a 0.19, far above the limit for intoxication. *See* § 42–4–1301(2)(a), C.R.S. (2009). All of this evidence is highly suggestive that Null "ha[d] consumed alcohol ... to a degree that [he was] substantially incapable, either mentally or physically, or both mentally and physically, to exercise clear judgment, sufficient physical control, or due care in the safe operation of a vehicle." *See* § 42–4–1301(1)(f) (defining "Driving under the influence"). Indeed, there was little chance that a blood test within two hours would have yielded exculpatory evidence.

Under these facts, where the *Turbyne* test for dismissal has not been met and where there was overwhelming evidence of intoxication, the trial court abused its discretion in dismissing the DUI charges, and the majority errs in affirming that dismissal.

## II.

I also disagree with the majority's conclusion that there were no "extraordinary circumstances" to excuse law enforcement's inability to administer a blood test to Null within the requisite two-hour timeframe. Maj. op. at 681. Under the plain terms of the statute, the ambulance service's repeated failure to respond was an "extraordinary circumstance[ ]" "beyond the control of, and not created by, the law enforcement officer who request[ed] and direct[ed] a person to take a blood or breath test ... or the law enforcement authority with whom the officer is employed." § 42–4–1301.1(2)(a.5)(IV)(A). In my view, the majority errs by relying on "ambiguity" in the statutory language to require that the prosecution demonstrate the reason why the service did not respond. Maj. op. at 679–80.

After we decided *Turbyne*, the legislature expressly adopted the "extraordinary circumstances" exception, which permits law enforcement to decline to give the test chosen by the defendant if the chosen test cannot be performed within two hours, and to direct the defendant to take the other test. § 42–4–1301.1(2)(a.5)(I). Section 42–4–1301.1(2)(a.5)(IV)(A) defines "extraordinary circumstances" as "*circumstances beyond the control of, and not created by,* the law enforcement officer who requests and directs a person to take a blood or breath test ... or the law enforcement authority with whom the officer is employed." (emphasis added). Under the plain terms of subsection (A), extraordinary circumstances are those that are beyond the control of the officer and the officer's employer. In this case, as noted above, the Washington County Sheriff's Office had a contract with the ambulance service under which the service agreed to provide medical personnel to the county jail for the purpose of performing blood draws, and although it had done so "several times" in the past, it failed to respond in this case, despite repeated requests.[2] There is nothing in the record to suggest that the ambulance service's failure to respond had anything to do with the actions of law enforcement. Therefore, under the plain language of the statute, "extraordinary circumstances" existed to support the officer's decision to direct Null to submit to a breath test.

The majority comes to the contrary conclusion by finding the statute to be "ambiguous." Maj. op. at 679–80. The majority relies on the fact that subsections (B) and (C) give examples of what does and does not constitute extraordinary circumstances. Under subsection (B), extraordinary circumstances include "weather-related delays, high call volume affecting medical personnel, power outages, malfunctioning breath test equip-

---

2. Because the service had responded "several times" in the past, the failure to respond in this case was not routine, contrary to the majority's suggestion. Maj. op. at 681.

ment, and other circumstances that preclude the timely collection and testing of a blood or breath sample ....” § 42–4–1301.1(2)(a.5)(IV)(B). Under subsection (C), extraordinary circumstances do not include “inconvenience, a busy workload on the part of the law enforcement officer or law enforcement authority, minor delay that does not compromise the two-hour test period ..., or routine circumstances that are subject to the control of the law enforcement officer or law enforcement authority.” § 42–4–1301.1(2)(a.5)(IV)(C). The majority concludes that subsections (B) and (C) “complicate rather than clarify” subsection (A) and in fact “conflict” with subsection (A). Maj. op. at 679, 679–80. More specifically, the majority concludes that because subsections (B) and (C) refer to circumstances that affect medical personnel, they imply that the prosecution must demonstrate the reason why medical personnel did not respond in a particular case (and presumably that the reason was extraordinary). *Id.* at 679 (discussing subsection (B)); *id.* at 679 (discussing subsection (C)).

But subsections (B) and (C) in no way conflict with subsection (A), nor do they require the prosecution to demonstrate the reason why medical personnel failed to respond. Subsection (A), by its plain terms, defines “extraordinary circumstances.” § 42–4–1301.1(2)(a.5)(IV)(A) (“As used in this paragraph (a.5), ‘extraordinary circumstances’ *means* circumstances beyond the control of, and not created by, the law enforcement officer ... or the law enforcement authority ....” (emphasis added)). And, as the majority acknowledges, it defines such circumstances as those “beyond the control of, and not created by,” law enforcement. Maj. op. at 679 (“[A]lthough subsection (A) might refer to law enforcement only, ....”). Thus, the definitional inquiry is controlled by subsection (A). Subsection (B) simply lists circumstances that would fall within the definition of subsection (A), such as “weather-related delays” and “high call volume affecting medical personnel.” While the majority is certainly correct that some of the circumstances listed in subsection (B) relate to medical personnel, maj. op. at 679, those circumstances are still ones that are beyond the

control of law enforcement under subsection (A). In other words, law enforcement has no control over the weather, or a high call volume affecting medical personnel. The definition of subsection (A) still applies and is controlling.

The same is true of subsection (C), which provides that, among other things, “inconvenience” is not an “extraordinary circumstance.” The majority takes from this reference that the prosecution must demonstrate that the reason that the ambulance service did not respond was not out of “inconvenience.” Maj. op. at 679. Again, the reference to “inconvenience” is simply an example of a circumstance that would fall outside the definition of subsection (A)—that is, inconvenience is not an extraordinary circumstance if it is within the control of law enforcement. Like subsection (B), subsection (C) in no way conflicts with subsection (A), but merely provides an illustration of its definition. Far from rendering subsections (B) and (C) “superfluous,” maj. op. at 679–80, this interpretation interprets all three subsections in a harmonious fashion without any “ambiguity” or “conflict.”

In sum, the question is not, as the majority sees it, whether the ambulance service had a good reason for not responding to the officer’s repeated requests to come to the jail. Maj. op. at 680. Instead, the question is whether the law enforcement authority or individual officer had any control over the service not coming. Here, they did not.

I also take issue with the degree of scrutiny the majority applies to the officer’s determination of extraordinary circumstances, which is essentially de novo review. Section 42–4–1301.1(2)(a.5)(I) states that *“[i]f a law enforcement officer* who requests a person to take a breath or blood test ... *determines* there are extraordinary circumstances ..., the officer shall inform the person of the extraordinary circumstances and request and direct the person to take and complete the other test....” (emphasis added). This section suggests that at least some deference must be paid to the officer’s determination that extraordinary circumstances are present, as it provides that if *the officer* deter-

mines that extraordinary circumstances exist, he or she "shall ... direct the person" to take the other test. The majority, however, treats this case as if the officer's determination of extraordinary circumstances were subject to de novo review. This may have been how we treated the issue under our caselaw prior to the passage of the statute. *See, e.g., Riley,* 104 P.3d at 222 (treating the matter as subject to de novo review). However, the legislature has now passed a statute on the matter and we must give effect to its terms.

It is important to note that, unlike the standard for dismissal of the charges described above, which the legislature did not address in its statute (and which is therefore governed by caselaw), the extraordinary circumstances determination is expressly governed by the new statute (which, in my view, supports a finding of extraordinary circumstances here). In our previous caselaw, which the majority finds informative, maj. op. at 679–80, we narrowly construed the presence of extraordinary circumstances because the statute did not recognize such a concept. *See, e.g., Riley,* 104 P.3d at 221–22 (noting that the sole statutory exception to following a defendant's chosen test was "where a breath test [wa]s impractical due to the driver's medical condition," and that the presence of·this one exception "is generally construed as excluding other exceptions"). The statutory language adopted by the legislature, by contrast, is broad in character. Indeed, the statute expressly recognizes that if the officer determines that extraordinary circumstances exist such that the chosen test cannot be performed, he or she shall direct the person to take the other test; it defines extraordinary circumstances in terms of circumstances beyond law enforcement's control; and it states that extraordinary circumstances "includes, *but shall not be limited to,*" § 42–4–1301.1(2)(a.5)(IV)(B) (emphasis added), the list provided in subsection (B). The majority's reliance on our earlier, narrow construction of extraordinary circumstances is thus misplaced.

Finally, it is not the case that this reading of the statute "allows the prosecution to present no evidence explaining why medical personnel refused to respond." Maj. op. at 680. Evidence of why medical personnel did not respond is certainly relevant to the determination of whether the circumstance was beyond the control of the individual officer or the law enforcement authority. *See, e.g.,* § 42–4–1301.1(2)(a.5)(IV)(B). In this case, however, such evidence does not exist. Unlike in *Turbyne* or *Riley,* where the ambulance service stated that it would not be able to send medical personnel to the jail within the requisite time period, *see Riley,* 104 P.3d at 219; *Turbyne,* 151 P.3d at 565–66, the ambulance service in this case did not respond *at all* to the repeated calls. Hence, law enforcement dispatch had no opportunity to follow up with the service to determine why it was not sending medical personnel to the jail. Law enforcement did, however, know that such non-response was itself extraordinary, as the officer testified that the usual protocol was to place a call to the ambulance service requesting a blood draw and that the ambulance service had responded "several times" in the past. Where, as here, there is no evidence as to why medical personnel did not respond, but other evidence supports the conclusion that the non-response was extraordinary and beyond the control of law enforcement, extraordinary circumstances exist under subsection (A).

### III.

For the foregoing reasons, I dissent from the majority's conclusion that the DUI charges against Null must be dismissed because he did not receive a blood test within the statutory two-hour period.